Larry Robert PEARMAN, Plaintiff,

v.

TEXACO, INC., Defendant.

No. 79–0964–CV–W–3.

United States District Court,

W. D. Missouri, W. D.

Nov. 21, 1979.

James K. Oppenheimer, Kansas City, Mo., for plaintiff.

Edward E. Schmitt, Louis Huber, III, Dietrich, Davis, Dicus, Rowlands & Schmitt, Kansas City, Mo., for defendant.

## ORDER

RUSSELL G. CLARK, District Judge.

Plaintiff filed a complaint on October 26, 1979 seeking a temporary restraining order and injunction relief prohibiting the defendant from terminating or non-renewing plaintiff's franchise as well as actual and punitive damages and attorney's fees. A temporary restraining order enjoining defendant from terminating or non-renewing the franchise relationship with plaintiff was issued on October 26, 1979 effective until November 5, 1979. The temporary restraining order was extended in accordance with Rule 65 of the Federal Rules of Civil Procedure on November 5, 1979 for an additional ten days. On November 8, 1979 a hearing on plaintiff's motion for a preliminary injunction was held. The parties agreed that the temporary restraining order would remain in effect until November 23, 1979 in order to give the Court an opportunity to review any additional suggestions the parties wished to submit.

Plaintiff's action is brought pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. which seeks to regulate the circumstances in which franchisors may terminate or refuse to renew franchises. 15 U.S.C. § 2802(a) provides:

(a) Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

15 U.S.C. § 2802(b) provides:

(b)(1) Any franchisor may terminate any franchise (entered into or renewed on or after June 19, 1978) or may fail to renew any franchise relationship, if—

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

The statutory provisions concerning non-renewal at issue in this case provide in § 2802(b)(3):

(3) For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.

Plaintiff's complaint alleged that on July 6, 1979 defendant attempted to terminate plaintiff's franchise relationship but that the termination did not comply with the Act. Additionally, plaintiff claims that the changes or additions to the contract proposed by Texaco were not the result of determinations made in good faith and in the normal course of business but were the result of Texaco's insistence upon such changes for the sole purpose of preventing the renewal of the franchise relationship.

The standards for determining whether a preliminary injunction should issue are delineated by the Act. 15 U.S.C. § 2805(b)(2) provides:

(2) Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

## FACTUAL FINDINGS

Based on testimony presented by the parties and stipulations agreed to, the Court makes the following findings:

1. Plaintiff began leasing the service station at I–435 and 51st Street in October of 1972. The rental agreement at that time provided that plaintiff would pay $595.00 per month plus .01 cent per gallon for each gallon of fuel delivered to the premises during the succeeding months. (Defendant's Exhibit 2.)

2. In June of 1977 Texaco asked plaintiff to sign a new three year lease with a rental rate of $1,100.00 per month during the first year of the lease, $1,350.00 per month during the second year, and $1,500.00 per month during the third year. (Defendant's Exhibit 3.)

3. Plaintiff was reluctant to sign the lease proposed in June of 1977 and Texaco eventually gave notice that the old lease was being terminated. Eventually however, Texaco withdrew its cancellation and plaintiff continued occupying the premises under the terms of the 1972 lease.

4. Plaintiff and Texaco have been involved in two disputes prior to the attempt to terminate plaintiff's lease in 1977. In April of 1973, representatives of Texaco padlocked plaintiff's pumps for ½ day. In 1976 Texaco sued Larry and Janice Pearman in the Magistrate Court of Jackson County claiming $1,909.25 plus interest for merchandise Texaco allegedly delivered to Mr. Pearman. The Magistrate Court found for defendant in that action and assessed costs against plaintiff. (See plaintiff's Exhibit 8.)

5. In June of 1979 a representative of Texaco, Mr. Woodrow Lowry, met with plaintiff and offered him a new three year lease. The proposed lease provided for rent at the rate of $1,400.00 per month the first

year, $1,600.00 per month the second year, and $1,941.00 per month the third year of the lease. (See defendant's Exhibit 4.) Mr. Pearman indicated that he would think about signing the lease. Further discussions between Mr. Pearman and Mr. Lowry concerning the lease were conducted over the phone. Mr. Pearman denies ever actually refusing to sign the lease.

6. On July 6, 1979, Texaco sent plaintiff notice that it was cancelling plaintiff's lease for his failure to agree to the changes in the terms of the lease. (See defendant's Exhibit 5 and plaintiff's Exhibit 1.) The Court finds that this notice complied with the requirements of 15 U.S.C. § 2804(c) in that it was in writing, sent by certified mail, contained a statement of intent not to renew the franchise, the reasons therefore, and the date on which the non-renewal would take effect. Also enclosed was a summary of the provisions of the Petroleum Marketing Practices Act compiled by the Secretary of Energy. (Defendant's Exhibit 5 and plaintiff's Exhibit 1.)

7. Plaintiff indicates that even after receiving defendant's notice of termination (plaintiff's Exhibit 1), he and Mr. Lowry had conversations concerning the new lease and possible continuations of the old lease. At one point plaintiff indicated he asked how soon Mr. Lowry could get the new lease to him. Mr. Lowry indicated that the lease had been returned to Oklahoma and when plaintiff had not signed it, Texaco considered it automatically cancelled and had made arrangements to lease the premises to someone else.

8. Texaco received a letter from plaintiff dated September 21, 1979 wherein plaintiff indicated that he was declining to sign the new lease because of the high rent. He further indicated that he felt his existing lease was automatically renewable and would initiate court action to enforce the lease if necessary. Plaintiff testified that the signature on the letter was not his and the Court after reviewing his signature on other documents notes that the signature on defendant's Exhibit 9 differs substantially from plaintiff's signature on other documents.

9. Mr. Pearman testified extensively concerning the effect that the rental increases would have on his net profits. In Mr. Pearman's view this rental increase would significantly decrease his net profits.

10. Mr. Lowry indicated that plaintiff called him in September to request that Texaco lease the premises to Jessie Brown, the manager of plaintiff's service station.

11. Prior to 1977, rental rates of Texaco filling stations were determined by the gallon volume of gas sold at that station. In 1977 Texaco determined that each filling station should be judged individually based on the value of the real estate where the station was located and other factors. Prior to 1977 leases had been for one year and automatically renewed. In 1977 the Texaco Company instituted a nationwide policy of three year leases with a flat monthly rental rate. The company was aiming to eventually realize a 10% return per year on their investment. Texaco admitted that this change in policy nationwide was dictated in part by inflation.

12. A stipulation entered into by the parties included the following facts.

(a) Texaco had leased the station at 4341 Northeast Chouteau Trafficway (adjacent to I–35) to Jim Leathers. Sales by Texaco to that station run approximately 22,027 gallons per month. Mr. Leathers has been operating under a three year contract since 1977. The terms of which provided for $800.00 per month rent for the year 1977–78; $845.00 per month rent for the year 1978–79; and $930.00 per month rent for the year 1979–80. The property at this location is valued at $115,000.

(b) The Texaco station at 3027 Van Brunt adjacent to I–70 leased by Mr. Lawrence has volume sales of 34,300 gallons of gas per month. Prior to February 1, 1980, the rental rate is $1,073.00 per month. Beginning February 1, 1980 the lessee will pay $1,180.00 per month rent and this amount will increase to $1,298.00 per month on February 1, 1981. The property at that location is valued at $160,000.

(c) The Texaco at 417 West 6th Street in Kansas City, Missouri adjacent to I–70 is being operated by Mr. Levy under a one year trial lease commencing on July 1, 1979 at the rate of $725.00 per month. That property is valued at $90,000 and average gas sales are 15,288 gallons per month.

(d) The Texaco station at 1318 Broadway near I–35 is being operated by Mr. Phillips on a three year lease the terms of which provided for rentals of $990.00 per month the first year of the lease; $1,080.00 per month the second year; and $1,198.00 the third year. The property at this location is valued at $180,000 and the station has average gas sales of 37,592 gallons per month.

13. Mr. Watson, area manager for Texaco in Missouri, Arkansas and Oklahoma, testified that the location of Mr. Pearman's Texaco was considered one of the top three locations in the Kansas City area. The other two locations considered in the same category with Mr. Pearman's station are a station operated by Mr. Hawkins on I–29 North and a station operated by Mr. Lead at the Kansas City International Airport. Mr. Hawkins' station was valued at $270,000 and had a monthly gasoline allocation of 72,000 gallons. Mr. Lead's station was valued at $300,000 and had a monthly allocation of 101,000 gallons. Mr. Hawkins was offered and accepted a three year lease at rental rates of $1,533.00 per month in 1978, $1,686.00 per month in 1979, and $1,855.00 per month in 1980. Mr. Lead's contract provided for a monthly rental rate of $1,735.00 per month commencing August 1, 1978; $1,908.00 per month commencing August 1, 1979; and $2,100.00 per month commencing August 1, 1980. Mr. Watson further indicated that the stations operated by Mr. Lawrence, Levy, Leathers and Phillips were in declining areas and utilized older equipment. The Hawkins, Lead and Pearman stations were much newer and were located in growing areas.

14. In determining the rental rates to be set, Texaco considered the history of the station, the desire for 10 to 10½% return, the market value of the property, the cost of maintenance, the type of neighborhood, Texaco's investment in the property, sales potential, and past performance. The company did not consider the amount of gasoline allocated to the station in determining the rental value.

15. In June of 1979 the allocation of gas for plaintiff's station was increased from 25,000 gallons per month to 60,000 gallons per month. This increase was the result of a letter written by Mr. Brown to the Department of Energy on the recommendation and advice of Mr. Lowry.

16. In the opinion of Mr. Schmelzer, a realtor-appraiser since 1946, who examined the Texaco at I–435 and 51st Street, the fair market value of the property was $227,500.00 ($160,000 for the land and $67,500 for the equipment). In Mr. Schmelzer's view a fair return on this property would have been $2,000 per month or $24,000 per year.

## CONCLUSIONS OF LAW

Neither party disputed that the franchise relationship between Mr. Pearman and Texaco had been terminated and Mr. Pearman's franchise not renewed. Thus, the Court finds that plaintiff met his burden pursuant to 15 U.S.C. § 2805(b)(2)(A)(i) of showing the franchise had been terminated or not renewed. The Court also finds that the hardship the Court is to weigh as set forth in 15 U.S.C. § 2805(b)(2)(B) are in plaintiff's favor. In the absence of unusual circumstances the balance of hardships imposed upon the franchisor by the issuance of a preliminary injunction will normally be less than the hardship imposed upon a franchisee if injunctive relief is not granted. In this case the franchisor may be subject to reduced rental rates if an injunction is issued. However, if an injunction is not issued, a source of revenue to the plaintiff will be lost. Thus, the Court concludes that the hardship caused by the issuance of the injunction falls less heavily on Texaco than the hardship on Mr. Pearman that non-issuance would create.

Thus, the real issue in this case is whether plaintiff, the franchisee, has demonstrated a sufficiently serious question going to the merits to make the question a fair ground for litigation. In one of the few cases discussing the burden imposed upon the franchisee under 15 U.S.C. § 2802(b)(2)(A)(ii), the United States District Court for the Eastern District of Michigan held:

> The use of the terms "serious question" and "fair ground" indicates that it intended a significant showing of something that would constitute some reasonable chance of success even though it could not be shown that there was a likelihood of probability of success as is required in the ordinary preliminary injunction matter.

> \* \* \* \* \* \*

> This statute is intended to require less than that but it is clear that it does require something. Instead of a "strong showing" or "probability" of success, the terms "serious question" and "fair ground for litigation" suggest merely a reasonable chance of success, something far less than the probability or likelihood required by *Virginia Petroleum Jobbers, [v. Federal Power Commission*, 104 U.S.App.D.C. 106, 259 F.2d 921] *supra*, . . . *Saad v. Shell Oil Co.*, 460 F.Supp. 114, 116–7 (E.D.Mich.1978).

The Court must evaluate whether there is a serious question as to whether the termination or non-renewal (1) was the result of action taken by the franchisor in good faith and in the normal course of business and (2) was not the result of Texaco's insistence upon the changes in the lease for the purpose of preventing the renewal of the relationship.

Plaintiff did present evidence of problems between Texaco and this plaintiff in 1973, 1976 and 1977. However, unlike the case of *Gilderhaus v. Amoco Oil Co.*, 1979–1 Trade Cases, p. 77936 (attached to plaintiff's suggestions in support of the motion for a temporary restraining order) there is no indication that plaintiff was treated any differently than any other franchisee when Texaco sought to make changes in plaintiff's lease in June of 1979. The lease offered plaintiff was the same form lease submitted to every other dealer. The only difference being in the amount of rent that plaintiff was charged.

All of the evidence presented supports the view that Texaco's shift from a yearly lease to a three year lease and the change in calculation of the rental rates was done in the normal course of business and in good faith. In comparing the rental rates charged plaintiff in the new lease with rental rates charged other dealers, the Court finds no bad faith nor any attempt to require higher rates for the purpose of preventing the renewal of the franchise. The Court recognizes that some stations had lower rental rates than plaintiff. It must be noted however that many of these stations with the lower rental rates were operating under contracts renegotiated for three year terms in 1977. The terms of the three year lease that plaintiff was requested to approve in 1977 were generally comparable to the terms of the other three year leases which were negotiated at that time. It is not unreasonable in this Court's view nor indicative of any bad faith on the part of Texaco that rental rates established for the years 1979 through 1982 would be higher than rates set and established in 1977 for the years 1977 through 1980.

Additionally, the stations run by Levy, Leathers, Lawrence and Phillips have lower monthly sales and the fair market value of those properties is significantly less than Mr. Pearman's station. The further fact that Texaco is able to find an individual willing to sign a one year lease under the same terms offered plaintiff also indicates that these terms were not offered for the purpose of preventing renewal of the relationship. Mr. Pearman argues that the fact that the new lessee was offered a one year lease indicates bad faith on Texaco's part. The Petroleum Marketing Practices Act contains a special provision for trial franchises that involve a franchise entered into for a period of not more than a year with an individual who has not been a party to a

franchise with the franchisor. See 15 U.S.C. § 2803. The testimony presented by Texaco was that as standard policy all new franchisees are offered an initial one year lease. The Court does not believe that Texaco's attempt to utilize the trial franchise provisions of 15 U.S.C. § 2803 is evidence of discrimination, retaliatory conduct or bad faith with regard to this plaintiff.

Plaintiff further challenges Texaco's failure to give weight to the gasoline allocation of each station in determining a fair rental rate. If Texaco had given consideration to this factor in determining the rent for some stations but not plaintiff's it might be some evidence that the rental changes were not requested in good faith in the normal course of business. However, uncontroverted evidence was presented that this had never been a factor considered by the company. Additionally, because of evidence that upon request plaintiff's station was easily able to obtain a substantial increase in allocation allotment, the Court is not prepared to find that allocation should have been considered by the company. Additionally, the Court does not believe that the Petroleum Marketing Practices Act was intended to authorize this Court to substitute its judgment as to what factors should or should not be considered in determining rental rates. Where rental changes are made in good faith, in the normal course of business and not for the purpose of preventing the renewal of the franchise relationship, the mere fact that the parties or the Court would have made a different business judgment or base that judgment on different factors is immaterial.

In addition to the increased rental charge plaintiff also challenges the provisions he interprets as requiring him to waive his rights under the Petroleum Marketing Practices Act, requiring him to abide by the terms and conditions of the lease between Texaco and Countrywide Stations, Inc. and the refusal of Texaco to negotiate various provisions in the contract. The Court finds that the requirement that plaintiff abide by the terms of the lease between Texaco and Countrywide and Texaco's refusal to negotiate various provisions of the form lease

are not sufficient to show a serious question going to the merits. The Court is concerned however with plaintiff's contention that in part his refusal to sign the lease was the result of Paragraph 10 of the contract which plaintiff interprets as requiring him to waive his rights under the Petroleum Marketing Practices Act. Plaintiff has acknowledged that Paragraph 10 was contained in the franchise agreement in October of 1972 but argues that Paragraph 10 is a substantial change in the terms of the contract because it requires plaintiff to waive his rights under a federal statute which was not in effect when the 1972 lease was negotiated. Texaco contends that Paragraph 10 is not a change in the term of the lease since this paragraph is substantially identical to the clause contained in the 1972 lease. For the purpose of the preliminary injunction issue, the Court is willing to treat Paragraph 10 as a change in the term of the contract; however, the Court finds that it was not inserted in bad faith since the same provision was in the 1972 lease.

This Court has a serious question as to whether a franchisee can be required to waive the notice and termination requirements of the Petroleum Marketing Practices Act. Allowing waiver would appear to this Court to frustrate the entire purpose of the Act. However, the Court is not faced at this juncture with the issue of whether the requirements of the Act may be waived since Texaco clearly attempted to comply with the requirements of the Act. The only issue at this time is whether a serious question arises as to whether or not the changes in rental rates and the inclusion of Paragraph 10 in the contract was adopted by the defendant in bad faith not in the normal course of business or for the purpose of preventing the renewal of this franchise. This portion of the contract, Paragraph 10, was obviously adopted in the normal course of business. No evidence suggested that its inclusion was in bad faith or in an attempt to prevent franchise renewal. The mere fact that this plaintiff may have been deterred from signing the contract because of the clause is not evi-

dence as to Texaco's intent in placing this provision in the contract. The evidence would seem to indicate that Texaco did not believe Paragraph 10 was a term which insistence upon would lead to non-renewal of the contract. No other dealer in this area had ever failed to approve a contract containing this provision. The Court might also add that it is not clear that Texaco regarded this paragraph as a waiver of the requirements under the Act. This paragraph was clearly contained in the 1972 lease which Texaco attempted to terminate in July of 1979 yet Texaco attempted to fully comply with every requirement of the Petroleum Marketing Practices Act. Although the Court questions the effectiveness of this clause, in waiving these particular statutory provisions, the Court concludes that its inclusion in the contract does not create a serious question as to whether the requirements of § 2082(b)(3) have been complied with.

Texaco additionally raised the issue of whether the contract between Mr. Brown and plaintiff (Plaintiff's Exhibit 11) was in fact a sublease in violation of the lease agreement between Texaco and Mr. Pearman. The Court has not given any weight to this issue in considering whether a preliminary injunction should issue. Texaco was evidently unaware of the exact terms of this agreement when it gave notice of non-renewal in July of 1979. Because the non-renewal notice did not rely on this alleged breach, this alleged breach may not subsequently be considered by the Court in determining if the non-renewal was in compliance with the terms of the Act. Unlike the cases cited by plaintiff where the evidence raised serious questions concerning the franchisor's good faith dealing, the Court does not believe that the evidence presented by plaintiff nor the inferences drawn therefrom raise sufficiently serious questions going to the merits to warrant the issuance of a preliminary injunction. For all of the above reasons, it is hereby

ORDERED that plaintiff's motion for preliminary injunction is denied; and it is further

ORDERED that plaintiff will be given fifteen days from the date of this order to indicate to the Court whether it wishes to present any additional evidence concerning the request for a permanent injunction.