James D. SCHEELE

v.

MOBIL OIL CORPORATION.

Civ. A. No. 79–1223–Z.

United States District Court,
D. Massachusetts.

March 9, 1981.

Jeffrey C. LaPointe, George G. Burke, Quincy, Mass., for plaintiff.

Marvin R. Finn, Spencer & Stone, Mark L. Sullivan, Boston, Mass., for defendant.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

Plaintiff in this action has brought suit alleging that defendant Mobil Oil Corporation has violated the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq.; Mass.Gen.Laws ch. 93E, § 5A; the unconscionability provision of the Massachusetts Uniform Commercial Code, Mass.Gen.Laws ch. 106, § 2–302; and the common law of undue influence. Defendant has moved to dismiss pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.

The pleadings and affidavits reveal that prior to June 9, 1977 plaintiff conducted business in Quincy, Massachusetts as a retail gasoline dealer pursuant to various franchise agreements previously entered into with the defendant. In the latter part of 1976 plaintiff suffered a heart attack which required his hospitalization. However, on June 9, 1977 he had recovered sufficiently to enter into a new lease and a new retail dealer contract with defendant both of which took effect November 1, 1977 and were to run until November 1, 1980. Plaintiff alleges that at various times thereafter agents of the defendant approached him and pressured him to execute a termination agreement citing his serious heart condition, his poor financial situation and a pending IRS investigation against him to collect unpaid taxes. On April 27, 1978, allegedly as a result of such pressure, plaintiff and defendant executed two mutual termination agreements terminating the service station lease and the retail dealer contract as of August 15, 1978. At that time plaintiff also signed and dated a handwritten statement on his own service station invoice stating "I wish to terminate my lease with Mobil Oil Corp. as of Aug. 1978. My own free will." Pursuant to these agreements plaintiff sold his inventory and turned over the station to the new dealer on August 16, 1978.

## I. Petroleum Marketing Practices Act.

Count I of plaintiff's complaint alleges a cause of action under the Petroleum Marketing Practices Act (PMPA). The PMPA was enacted in 1978 for the twofold purpose of remedying the effects of disparate bargaining power between franchisors and franchisees and of establishing uniform national guidelines for the conduct of franchise relationships. S.Rep.No.95–731, 95th Cong., 2d Sess. 18–19, reprinted in [1978] U.S.Code Cong. & Ad.News 873, 877 (hereinafter cited as Senate Report). It limits

the termination or non-renewal of franchise relationships to the grounds provided for in the statute and sets forth notification requirements for all such terminations and non-renewals. The Act provides for enforcement by enabling the franchisee to sue in federal court for injunctive and declaratory relief and damages.

■ Defendant initially maintains that the Act is not applicable to the instant action as it does not apply to termination of franchises which were entered into prior to June 19, 1978 the effective date of the Act.[1]

While the defendant's contention is technically correct as it relates to the termination provisions of the statute, the Act embraces the present situation in its non-renewal provisions. Section 2801(14) defines "non-renewal" as "a failure to reinstate . . . the franchise relationship . . . following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978, and has not been renewed after that date." Since the termination of the franchise took place in August 1978 and the franchise has not been renewed thereafter, the present case is encompassed in the Act's non-renewal provisions. Accord, Gilderhus v. Amoco Oil Co., 470 F.Supp. 1302 (D.Minn.1979).

The legislative history of the Act supports this interpretation. It is clear from the Senate Report accompanying this legislation that Congress was concerned about possible constitutional problems presented by holding franchisors liable for terminations occurring after the effective date of the Act if the franchise had been entered into before that date. The Senate Report states:

> If the provisions of this title were made applicable to franchise terminations, in the case of franchises entered into prior to date of enactment of the legislation, it might be contended by the franchisor that the limitations imposed by the legislation upon termination rights such franchisor may have under the franchise

agreement denies him the benefit of a valuable property right and thereby amounts to a "taking" of property without payment of just compensation. The legislation, therefore, contemplates that the franchisor may . . . terminate a franchise entered into prior to the date of enactment of the legislation (and not renewed thereafter) without regard to the provisions of this title respecting franchise termination. However, the definitions of the terms "fail to renew" and "nonrenewal" trigger the applications of the renewal provisions of this title, once such a termination is effected. In such a case, the franchisor is required to renew the "franchise relationship" unless a ground for non-renewal exists under this title.

*Senate Report, supra* at 890. Since any renewal of the franchise relationship can be based upon terms and conditions substantially different from those of the original franchise, the legislation affords the franchisor an opportunity to obtain compensation for any loss in flexibility which may occur as a result of the Act's application to future termination decisions.

It is in this manner that Congress brought the franchisor, who entered into a franchise agreement before the effective date of the Act and terminated it after that date, within the provisions of the statute while at the same time avoiding any constitutional infirmity. Faced with the clear statutory language as well as the legislative history it is impossible for this Court to hold that the PMPA does not apply to the facts of this case.

■ Defendant next contends that if the PMPA is applicable here the Act itself is unconstitutional as applied to these parties because it retroactively imposes a notice requirement with which it would be impossible to comply.

The Act provides for non-renewal or termination of a franchise relationship by mu-

1. Section 2802 of the Act which defines the permissible grounds for termination of franchise relationships applies to all franchises "en-

tered into or renewed on or after June 19, 1978" 15 U.S.C. § 2802(b)(1) (1978).

tual termination agreement if three requirements are met: 1) the agreement is entered into not more than 180 days prior to the date of termination; 2) the franchisee is provided with a "summary statement" published by the Secretary of Energy setting forth the provisions of the Act; and 3) the franchisee has not provided written notice to the franchisor repudiating the agreement within 7 days of receiving the agreement. 15 U.S.C. § 2802(b)(2)(D).

It is not disputed by either party involved here that the 180 day requirement has been met and that there was no notice provided by plaintiff within 7 days of receiving the agreement repudiating that agreement. Nor is it disputed that the other notice requirements embodied in the Act have been complied with.[2] Defendant does contend however that it could not have provided a summary statement because this statement had not yet been promulgated at the time the mutual termination agreements were entered into in April of 1978. Consequently, defendant contends that because the PMPA requires such compliance it is in effect unconstitutional.

Defendant's claims however do not square with the plain language of the statute. Section 2804(d)(2) states that "in the case of summaries required to be furnished under the provisions of section 2802(b)(2)(D) of this title . . . before the date of publication of such summary in the Federal Register, such summary may be furnished not later than five days after it is so published." 15 U.S.C. § 2804(d)(2). Since the statute requires that the summary statement be published in the Federal Register within thirty days of June 19, 1978, 15 U.S.C. § 2804(d)(1), and this was in fact done, it was possible for defendant to comply with the provisions of the Act. Consequently the PMPA is not unconstitutional as applied to the facts of this case.

While it would appear that the plaintiff is being hypertechnical in pressing this aspect of his claim for relief in view of the relatively narrow issue involved here this Court is bound by the plain language of the statute and its obligation to construe the PMPA in such a way as to avoid any serious doubt as to its constitutionality. *International Association of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). Consequently, defendant's motion to dismiss Count I of the complaint is denied.

**II. Mass.Gen.Laws ch. 93E, § 5A.**

■ Count II of plaintiff's complaint alleges that defendant violated Mass.Gen. Laws ch. 93E, § 5A in terminating its franchise agreements with him without due cause and without supplying written notification of the specific grounds for termination. That provision of the statute states in part:

> It shall be deemed a violation . . . for a supplier to terminate, cancel, or not renew a marketing agreement of any retail dealer without due cause. . . . Such supplier shall notify a retail dealer in writing of the termination or cancellation of the marketing agreement of such retail dealer at least sixty days before the effective date thereof, stating the specific grounds for such termination or cancellation . . .

Mass.Gen.Laws ch. 93E, § 5A (1976).

It is apparent from the language of the statute that Section 5A is directed to the *unilateral* termination decision made by the supplier regarding a dealer's franchise. In such a case due cause and notification are necessary prerequisites in order to protect the dealer's interests. However, in the case of *mutual* termination agreements, in which the dealer participates and voluntarily relinquishes his rights in the marketing agreements, such elements as due cause and

---

**2.** Section 2804 requires the franchisor to furnish notification of any termination or nonrenewal to the franchisee not less than 90 days prior to the termination or nonrenewal unless this requirement is unreasonable under the circumstances. Such notice must include a statement of intention to terminate or not renew, the date on which such action will take effect and the summary statement referred to above. The mutual termination agreements in April of 1978 fulfilled all of these requirements except the summary statement discussed in the text of this opinion.

notification are rendered unnecessary. Where both parties agree to terminate a franchise relationship any reason is sufficient to justify that termination. I must take heed of the admonition of the Massachusetts Supreme Judicial Court that while this statute was clearly enacted to eliminate the historic disadvantage of gasoline dealers in relation to oil companies, I "should not assume a legislative intention to overcompensate and thus to generate inequities against suppliers." *Amoco Oil Co. v. Dickson*, —— Mass. ——, 79 Mass.Adv.Sh. 1212, 389 N.E.2d 406 (1979).

Since the agreements entered into between plaintiff and defendant herein were mutual termination agreements,[3] Section 5A does not apply and defendant's motion to dismiss Count II of the complaint is granted.

### III. Unconscionability.

■ Count III of plaintiff's complaint alleges that the mutual termination agreements were unconscionable under Mass. Gen.Laws ch. 106, § 2–302 because they were executed under duress. Defendant moves to dismiss this claim on the ground that Article 2 of the Uniform Commercial Code relates solely to the sale of goods and the mutual termination agreements do not involve the sale of goods but provide merely for the termination of other contracts.

In view of the recent case of *Zapatha v. Dairy Mart, Inc.*, —— Mass. ——, 80 Mass. Adv.Sh. 1837, 408 N.E.2d 1370 (1980) in which the Massachusetts Supreme Judicial Court applied the unconscionability provision to "all aspects of the franchise agreement" including the termination clause of that agreement, defendant's interpretation is too narrow to comport with a proper reading of the Code. While the mutual termination agreements involved herein did not themselves deal with the sale of goods they must be placed in the context of the entire franchise relationship to which they

relate which did in fact deal explicitly with such a sale. Artificial distinctions such as those urged on this Court by defendant are not conducive to a fair or reasoned reading of the Code nor are they in accord with the Supreme Judicial Court's stated intention to read the statute to permit the selective application of its principles to situations which it does not govern explicitly when such a reading is reasonable. *Zapatha v. Dairy Mart, Inc.*, —— Mass. ——, 80 Mass. Adv.Sh. 1837, 408 N.E.2d 1370, 1375 (1980). Accordingly, defendant's motion to dismiss Count III of the complaint is denied.

### IV. Undue Influence.

Count IV of plaintiff's complaint alleges that defendant's agents exerted undue influence upon him causing him to execute the mutual termination agreements. Defendant argues that this Count should be dismissed relying upon affidavits and deposition testimony of plaintiff in which he admitted that he read and understood the mutual termination agreements prior to signing them, suffered from no mental problems from that time until August 16, 1978, was never threatened with physical force by defendant's agents, and signed the agreements of his own free will.

■ The essence of "undue influence" is the subversion of another person's free will in order to obtain assent to an agreement. *Francois v. Francois*, 599 F.2d 1286 (3d Cir. 1979), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 679, 62 L.Ed.2d 653 (1980). Insofar as plaintiff's claim rests upon his allegation of a lack of free will his deposition testimony would appear to be dispositive on this issue.

■ However insofar as plaintiff's deposition reveals a dispute concerning possible threats to cut off the supply of gas to the plaintiff if he did not comply with the de-

---

**3.** The language of the agreement terminating the retail dealer contract reads "In consideration of our mutual agreements hereinafter contained, it is hereby agreed by . . . Seller and . . . Buyer that the within Retail Dealer Contract . . . is hereby terminated as of the 15th day of August 1978." The agreement terminating the Service Station Lease contains similar language.

mand to terminate his franchise[4], plaintiff is entitled to pursue his claim of undue influence. Threats to put another out of business or to deprive another of his livelihood may constitute duress. *Jamestown Farmers Elevator, Inc. v. General Mills, Inc.*, 552 F.2d 1285 (1977). Consequently, defendant's motion to dismiss Count IV of the complaint is denied.

In summary defendant's motion to dismiss is granted with respect to Count II of the complaint and denied with respect to Counts I, III and IV.

---

[4]. Plaintiff's deposition testimony on this issue appears to be conflicting. At one point plaintiff stated "... they just threatened I wouldn't be able to get gas.... [t]hey said: We can cut off the supply." At another point however he denied having been threatened with a supply cut-off as an inducement to sign the termination agreements.