Abraham GRUBER, Plaintiff,

v.

MOBIL OIL CORPORATION, a foreign
corporation, Defendant.

No. 83–CV–1155.

United States District Court,
E.D. Michigan, S.D.

Aug. 19, 1983.

Mark H. Cousens, Detroit, Mich., for plaintiff.

Donald B. Miller, Detroit, Mich., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHILIP PRATT, District Judge.

Plaintiff brings his claim pursuant to the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 *et seq.*, alleging that Mobil Oil Corporation illegally failed to renew its franchise and lease agreements with plaintiff. The defendant Mobil Oil maintains that the PMPA permits the non-renewal since plaintiff continually refused to comply with the hours of operation in the lease agreement, which defendant asserts is a reasonable and material provision justifying nonrenewal. 15 U.S.C. § 2802(b)(2)(A) & (B). Defendant also asserts that it is justified in not renewing the agreement because plaintiff failed to maintain the premises in a clean, healthy and safe condition as required by the franchise agreement. *Id.* § 2802(b)(3)(C).

Before plaintiff was recruited to operate a Mobil station by franchise arrangement, plaintiff was a mechanic in several garages and gas stations. In early 1978, the defendant's marketing representative approached the plaintiff about operating a vacant Mobil station at the intersection of Orchard Lake Road and Northwestern Highway in Oakland County. Plaintiff then entered into a lease agreement and franchise relationship with defendant in April of that year. When plaintiff reopened the station, it was surrounded by a moderately populated residential area, with few nearby businesses. Today the station stands at one of the most rapidly growing business and residential sections of the county.

Plaintiff operates a full service station, which includes sales of gasoline, some car parts and does major auto repairs. Due to his interest in foreign auto repairs, plaintiff set out to penetrate the foreign auto repair market in the area. He had acquired and continued to develop a reputation in repairing foreign cars. Plaintiff advertised his skill in foreign car repair in the newspapers and by placing signs and expensive cars in front of the station.

All the lease agreements between the parties have contained clauses establishing hours of operation. Since 1979 each lease has required plaintiff to operate the station between the hours of 6:00 a.m. and 12:00 p.m. Monday through Saturday and between 8:00 a.m. and 8:00 p.m. on Sunday and holidays. Mobil establishes different hours for each station based on the volume of traffic in the area at different hours, the hours competitors in the area remain open, and types of business which surround the

station. For a time Mobil did not require the plaintiff or any other dealer to follow the hours of operation provided in the leases due to the gas shortages of 1978 and 1979. When the shortages ended, Mobil again required all of its franchisees, including plaintiff, to maintain the hours provided in the lease.[1] Despite Mobil's frequent insistence that plaintiff adhere to those hours, plaintiff by his own admission, kept hours of approximately 7:00 a.m. to 11:00 p.m. Monday through Saturday and hours significantly less than 8:00 a.m. to 8:00 p.m. on Sunday.[2] After considerable pressure to conform, plaintiff "experimented" with maintaining the lease hours for short periods on three separate occasions, but each time went back to his own hours of operation. Plaintiff asserts that the reason he kept shorter hours is because he lost money when operating the station in conformance with the lease hours. He maintains that the hours he had established is the optimum period of operation.

On several occasions prior to the notice of nonrenewal, Mobil personnel notified plaintiff of the unsatisfactory condition in which the station was maintained. These notifications were primarily oral, although some were written and delivered to the plaintiff, and normally specified the exact conditions that required correction. The most frequent complaints were that plaintiff parked cars in front of the station, left merchandise unstacked and in disarray, and generally did not keep the station reasonably clean, according to the lease agreement.[3] Although plaintiff never refused to comply with Mobil's demands, it is apparent that he never fulfilled its requirements.

Plaintiff not only maintains that the grounds for nonrenewal are not valid, but that they are a pretext for Mobil's actual desires. Although Mobil does not own the property on which the station stands, Mobil is considering converting the station from full service to a "gas & snack" operation, which would involve primarily the sale of gas and oil and vending machine snacks but not include auto repair. The "gas & snack" configuration would be more profitable to Mobil, since it is expected to generate higher gasoline sales. Plaintiff states that the reason Mobil is trying to "drive" plaintiff from the station is because the PMPA requires Mobil to offer for sale to the plaintiff its interest in the property, unless plaintiff were to consent to the destruction and rebuilding of the station necessary to convert the station to a "gas & snack" operation. 15 U.S.C. § 2802(b)(3)(D)(i)(II). Since plaintiff refused to consent to the rebuilding of the station as a "gas & snack"

1. Plaintiff does not claim that this waiver constitutes a modification of the franchise agreement.

2. Defendant presented persuasive evidence which shows that plaintiff did not even adhere to those shortened hours. Frequently plaintiff would keep the station open for periods much shorter than the 16-hour day he alleges to have maintained.

3. Clause 7 of the lease agreement provides:
   7. *Appearance Obligations—Tenant.* Tenant shall keep the premises clean, orderly and well-lighted at all times. In addition, Tenant shall: (a) keep adjacent sidewalks, curbs and drives in good and safe condition and free from snow, standing water, oil, grease, other products, and obstructions; (b) provide adequate water, maintenance and care necessary to sustain all plants, shrubs and grass areas on or about the premises; (c) keep the rest rooms clean, neat sanitary and supplied adequately with towels, toilet paper and soap; (d) keep the drive areas clear of obstructions, not use the premises for the sale of new or used vehicles, not retain disabled or unregistered vehicles on the premises for more than 48 hours, and not park vehicles in areas other than those designated by Landlord for parking; (e) not place rental devices, vehicles or equipment on the premises without Landlord's prior written consent, except the Tenant may, without such approval, install inside the service station building, storage and merchandising equipment for soft drinks, candy and tobacco products if removable without damage to the premises; (f) not make or permit alterations or additions in the premises or place any additional structures on the premises without Landlord's prior written approval, except that Tenant may, without such approval, install storage and merchandising equipment for petroleum products, tires, batteries and automotive accessories if removable without damage to the premises and if permissible under applicable law.

operation and since Mobil does not want to give up its interest in the station, plaintiff claims that Mobil's grounds for nonrenewal are merely a sham to hide its true motivation.

## I. BACKGROUND OF THE PMPA

Congress enacted the PMPA to govern franchise relationships between refiners and dealers. The Act is intended to remedy the extreme disparity of bargaining power between refiners and dealers and to create uniform standards in franchise relationships. It is to remedy the historic disadvantage gasoline dealers have experienced by preventing arbitrary terminations and nonrenewals. *E.g., Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1216–17, 1220 (7th Cir.1982) ("the Act is clearly intended to prevent . . . the appropriation of hard earned good will which occurs when a franchisor arbitrarily takes over a business that the franchisee has turned into a successful going concern");[4] *Scheele v. Mobil Oil Corp.,* 510 F.Supp. 633, 634 (D.Mass.1981); *Gilderhus v. Amoco Oil Corp.,* 470 F.Supp. 1302, 1303 (D.Minn.1979) ("The primary purpose of the Act is to protect petroleum franchisees from overbearing and discriminatory termination practices by franchisors"); *Saad v. Shell Oil Co.,* 460 F.Supp. 114 (E.D.Mich. 1981).[5]

The PMPA's basic method of striking the balance in the franchise relationship is to delineate specific grounds and standards under which the franchisor can terminate or not renew the franchise agreement. Mobil claims its nonrenewal is proper under the following three sections of the Act:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure—

(i) not more than 120 days prior to the date on which notification of termination of nonrenewal is given, if notification is given pursuant to section 2804(a) of this title . . .

(B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if—

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

(ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

15 U.S.C. § 2802(b)(2)(A) & (B).

(C) A failure of the franchisee to operate the marketing premises in a clean, safe, and healthful manner, if the franchisee failed to do so on two or more previous

---

**4.** In *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1216 (7th Cir.1982), the court stated:

Congress designed the PMPA to allay three specific concerns: that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and that termination or nonrenewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one.

*See* S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* [1978] U.S.Code Cong. & Ad.News 873, 875–77.

**5.** In remedying the dealers' historic disadvantages, however, Congress did not intend to un-

duly interfere with the franchisors' legitimate business decisions:

Legislation in this subject area requires recognition of the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee, including certain failures to comply with contractual obligations or upon certain changes in circumstances. Particularly important is that legislation dealing with this subject recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.

S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* [1978] U.S.Code Cong. & Ad.News 873, 877.

occasions and the franchisor notified the franchisee of such failures.

*Id.* § 2802(b)(3)(C).

## II. TIMELINESS OF DEFENDANT'S GROUNDS FOR NONRENEWAL

Plaintiff alleges that Mobil's ground for nonrenewal based on § 2802(b)(2)(A) is barred by that subsection's time limitations. Subsection 2802(b)(2)(A) prohibits the refiner from not renewing the franchise for franchisee's failure to comply with a reasonable and material provision of the lease if the refiner had knowledge of this failure 120 days prior to notice of nonrenewal. Plaintiff argues that this provision only permits termination or nonrenewal if the franchisor *first* acquired knowledge of the violation not more than 120 days prior to the notice of nonrenewal. According to plaintiff, although defendant did notify plaintiff of plaintiff's continual failure to adhere to provisions of the lease within the 120 days, defendant is not justified in relying on those failures because defendant had knowledge of failures that occurred, and notified plaintiff of them, prior to the 120-day limitation period.

■ Plaintiff misconstrues the application of § 2802(b)(2)(A) to the instant case. The time limitation is intended "to preclude a franchisor from basing termination or non-renewal upon old and long forgotten events." S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* [1978] U.S.Code Cong. & Ad.News 873, 892 ("Senate Report"). When the alleged failure to conform with the lease is ongoing, occurring within and prior to the 120-day limitation, then the breaching event is not considered stale, but rather, viewed as a new ground for terminating the relationship each time the franchisee fails to comply. *See e.g., Escobar v. Mobil Oil Corp.,* 522 F.Supp. 593, 601–02 (D.Conn.1981); *Walters v. Chevron U.S.A.,*

*Inc.,* 476 F.Supp. 353, 356–57 (N.D.Ga.1979), *aff'd,* 615 F.2d 1135 (5th Cir.1980). Although defendant knew of the plaintiff's alleged breach prior to the 120 days of the notice for nonrenewal, plaintiff's continual breach within the 120 days gives defendant new grounds for relying upon § 2802(b)(2)(A) to justify its nonrenewal of the franchise. Therefore, defendant is not barred from not renewing the lease by the time limitations of § 2802(b)(2)(A). If the Court were to rule otherwise, then either (1) a franchisee's carelessness or willful breach will be rewarded if it continues beyond the time period, or (2) franchisors will be encouraged to terminate all breaches of the lease within 120 days of its first occurrence without giving the franchisee the opportunity and time to make reasonable efforts to remedy a breach.

## III. NONRENEWAL BASED UPON FAILURE TO COMPLY WITH THE HOURS PROVISION OF THE LEASE

Mobil justifies its nonrenewal of the franchise agreement with plaintiff, in part, upon plaintiff's failure to adhere to the hours of operation provision of the lease. Mobil asserts that this failure allows a nonrenewal of the lease under § 2802(b)(2)(A), since the lease provision is both reasonable and material to the lease, and under § 2802(b)(2)(B), because plaintiff failed to exert a good faith effort to carry out the hours provision after being given written notice.

Plaintiff initially urges this Court to apply an objective standard as to what constitutes a "provision [which] is both reasonable and of material significance to the franchise relationship" under § 2802(b)(2)(A). Plaintiff states that a provision must be reasonable from the perspective of both the franchisee as well as the franchisor.[6] Further,

---

6. Plaintiff does not cite any cases which apply an objective standard in construing 15 U.S.C. § 2802(b)(2)(A). Instead, plaintiff relies on the court's interpretation of § 2802(b)(3)(A) in *Munno v. Amoco Oil Co.,* 488 F.Supp. 1114 (D.Conn.1980). In *Munno,* the court rejected plaintiff's contention that "good faith" in

§ 2802(b)(3)(A) incorporated more than simply subjective good faith. The *Munno* court relied on the fact that Congress had deleted a reasonableness requirement from that subsection before enactment. In the instant case, plaintiff argues that since reasonableness is a requirement of § 2802(b)(2)(A), an objective standard

plaintiff contends that the hours provision is objectively unreasonable because plaintiff loses money by operating the longer hours required by the lease.[7] The Court does not agree with plaintiff's position.

■ The reasonableness and materiality of a franchise provision under § 2802(b)(2)(A) is not a wholly objective determination. Rather, the legitimate business judgments of the franchisor are given considerable weight. *See e.g., Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1219–23 (7th Cir.1982); *Bellmore v. Mobil Oil Corp.,* 524 F.Supp. 850, 853–54 (D.Conn.1980); *Crown Central Petroleum Corp. v. Waldman,* 515 F.Supp. 477, 483 (M.D.Pa.1981); *Munno v. Amoco Oil Co.,* 488 F.Supp. 1114, 1118–21 (D.Conn.1980); *Pearman v. Texaco Corp.,* 480 F.Supp. 767, 772 (W.D.Mo.1979); *Malone v. Crown Central Petroleum Corp.,* 474 F.Supp. 306, 311 (D.Md.1979). In *Brach v. Amoco Oil Co., supra,* the Seventh Circuit provided a test to determine the materiality of a lease provision under § 2802:

"While it is essential that the district court here examine the economic foundation for the real estate contract in order to determine that materiality of the default, that inquiry is a narrow one. Congress cautioned that courts, in evaluating such economic business decisions, should not apply the so-called 'reasonable business judgments' test, but must follow the Act's two-fold test … First, the franchisor determination must have been in 'good faith', a subjective standard. … Second, the determination must have been made 'in the normal course of business.' "

677 F.2d at 1222.

■ The question of materiality revolves around the importance of an hours provision in the franchise agreement. The Court is to apply a very limited or restrained objective test in its analysis.[8] The two-prong test does not permit the Court to substitute its judgment for decisions derived from ordinary business experience and knowledge. This test is consistent with Congress' desire to restrict the courts' scrutiny of legitimate business judgments.[9] Under the *Brach* test, the hours provision in the parties' franchise agreement is of material significance. First, no evidence indicates that Mobil did not act in good faith in requiring certain hours of operation in the lease agreement. An hours of operation provision is a standard clause in all Mobil leases. There is no showing that the provision is somehow designed to bring hardship on this plaintiff. Hence, Mobil cannot be seen otherwise than acting in good faith in requiring an hours of operation clause in

---

was somehow intended. Plaintiff's creative argument is neither supported by the case law nor the legislative history and is not persuasive to the Court.

**7.** Plaintiff also appears to argue that not only is the hours provision not reasonable, but that even if it is, plaintiff's breach is reasonable since it only reduces the operating hours by approximately two hours a day. There are several problems with this contention. Foremost, unless the breach is a minor or technical one, *see* S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* [1978] U.S.Code Cong. & Ad.News 873, 876, the PMPA does not appear to permit allegations of reasonableness of the breach to prevent valid nonrenewal. The Act specifically establishes grounds for nonrenewal under § 2802(b)(2)(A) as the franchisee's failure to comply with reasonable and material provisions of the lease. It does not state that the failure must only be unreasonable. Moreover, even if this Court were to apply a reasonableness standard to the breach, plaintiff has

not shown that the breach was reasonable. Other than his bare statement that he would lose money by operating at the longer hours of the lease, there is no evidence that plaintiff's breach was at all justified. Instead, the plaintiff's refusal to comply with the lease stems from nothing else than his own belief in how the station should be operated.

**8.** *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1222 (7th Cir.1982), *citing Castaneda-Gonzalez v. I.N.S.,* 564 F.2d 417, 431 (D.C.Cir.1977).

**9.** Quoting from the legislative history of the Act the *Brach* court stated: "These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or nonrenewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the courts to determine whether a particular marketing strategy …. is a wise business decision." S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, 37, *reprinted in* [1978] U.S.Code Cong. & Ad.News 873, 896.

the lease. *See Munno v. Amoco Oil Corp., supra,* 488 F.Supp. at 1118–21. Second, the provision satisfies the second prong of the test, since establishing the hours of operation was done in the normal course of business. In order to maintain a certain degree of availability and uniformity in the marketing of its products, Mobil consistently established hours of operation in all of the lease agreements in the area. In fact, objectively speaking, the hours provision is of material importance, because it ensures a minimum period for which Mobil products and services can be displayed to the public—it is, in effect, an advertisement that Mobil will provide the motorist its products at the motorist's convenience. Therefore, the hours provision can only be characterized as material to the franchise agreement under § 2802(b)(2)(A).

The issue of reasonableness inquires as to the reasonableness of the hours actually established in the agreement between plaintiff and defendant. The *Brach* court stated the following standard to be applied:

> "Even if the default is found to be material to the relationship, the court should determine the reasonableness of the contract itself. This, of course, is a similarly limited inquiry, and deference must be given the legitimate business decisions of franchisors. *See Crown Central Petroleum Corp. v. Waldman,* 515 F.Supp. 477 (M.D.Pa.1981); *Malone v. Crown Central Petroleum Corp.,* 474 F.Supp. 306 (D.Md.1979). It is sufficient that the policy or contract has a basis in common sense and experience and is not unconscionable. *Waldman,* 515 F.Supp. at 483...."

677 F.2d at 1223.

Under this standard, the hours established in the lease are reasonable and provide defendant legitimate grounds for nonrenewal of the lease agreement. As mentioned, Mobil calculates the hours each individual station is to operate based upon such factors as the hours the competition in the area remain open, the volume of traffic at different hours and the types of businesses which surround the station. This formula is designed to determine the optimum hours the dealer should offer Mobil products and service to the public and remain profitable. Mobil desires its stations to develop a reputation for dependability, so that credit card holders, for example, and other early morning or late evening travelers will find Mobil stations available to satisfy their needs. The hours provided in the lease reflect the consideration of all of these factors. The clause in the case at bar is consistent with hours other stations in the area are required to operate and, in fact, are considerably shorter than hours maintained by the competitors in the immediate area. Thus, the hours established in the lease are the result of a legitimate business decision "based in common sense and experience", and reasonable within the meaning of § 2802(b)(2)(A). *Brach v. Amoco Oil Co., supra,* 677 F.2d at 1223; *Crown Central Petroleum Corp. v. Waldman, supra,* 515 F.Supp. at 483; *Malone v. Crown Central Petroleum Corp., supra,* 474 F.Supp. at 311. *See Pearman v. Texaco,* 480 F.Supp. 767, 772 (W.D.Mo. 1979).

Although the Court is not to look at the reasonableness of the provision from the franchisee's perspective (except to determine if the clause is unconscionable), even from this "objective" viewpoint the hours clause is reasonable. Plaintiff claims that he would lose money operating the extra hours in the morning and at night, and the longer hours on Sundays. There are several problems with plaintiff's argument. First, although plaintiff says he will lose about $50 a week in opening and closing in conformity with the lease, he does not present any concrete evidence of the loss. Second, and more importantly, plaintiff never operated the station at the lease hours for a period long enough to determine if those extra hours were actually unprofitable. Plaintiff only conducted operations during the specified lease hours for short periods on three separate occasions. Defendant is correct to point out that this is not a long enough time to prove plaintiff's contention. In order to influence potential customers' buying habits, it appears a testing period of two to three months of strict

conformance would provide more validity.[10] Third, plaintiff's claim of potential loss is weakened because it does not appear that plaintiff told Mobil that losing money was the reason he maintained shorter hours. When confronted by Mobil on several occasions as to the reason for not following the hours in the lease, plaintiff would come up with a variety of excuses, but profit loss was not mentioned. If plaintiff had expressed this reason Mobil would have been willing to review plaintiff's method and hours of operation in order to arrive at a solution.

From the foregoing the Court concludes that defendant was justified in not renewing the franchise because of plaintiff's continual breach of a reasonable and material provision of the franchise agreement under § 2802(b)(2)(A). Therefore, it is unnecessary for the Court to examine the appropriateness of the nonrenewal pursuant to § 2802(b)(2)(B), although it is certain that defendant is equally justified in nonrenewing the relationship under that provision also.[11]

## IV. NONRENEWAL BASED UPON FAILURE TO MAINTAIN CLEAN PREMISES

Defendant also relies upon § 2802(b)(3)(C) for not reviewing the franchise relationship. Subsection 2802(b)(3)(C) permits nonrenewal if the franchisee has failed to operate the station in a "clean, safe, and healthful manner" after being notified by the franchisor of such failures two or more times.[12] Plaintiff was in-

formed on numerous occasions, both orally and in writing, of Mobil's dissatisfaction with the appearance of the station. Such notices satisfy the notice requirement of § 2802(b)(3)(C). *See Frisard v. Texaco, Inc.,* 460 F.Supp. 1094, 1101 (E.D.La.1978).

The appearance and cleanliness and safety conditions of the station was an ongoing problem.[13] First, plaintiff constantly parked cars in front of the station in order to advertise his specialty in foreign car sales. As is defendant's right under the lease agreement,[14] Mobil requested that plaintiff remove cars from areas in front of the station that blocked view and access. Plaintiff would move the cars temporarily, but soon would place them again in front of the station. Plaintiff also parked numerous cars along the side of the station. Presumably, these cars were to be repaired or had been repaired by plaintiff. With the many autos parked all over the station, the station always looked cluttered and, at times, was difficult to even enter.

Of equal importance was the generally dirty condition in which the station was maintained. Grease and oil spills covered not only the garage floor, but also the ground around the pumps. Merchandise was normally unstacked and merchandising receptacles left empty and unclean. Auto parts and tires were piled throughout the station. Broken windows were not repaired. Windows were rarely cleaned. These and other failings were specifically brought to the plaintiff's attention on numerous occasions.[15] In fact, Mobil district

---

**10.** *See Malone v. Crown Central Petroleum Corp.,* 474 F.Supp. 306, 311 (D.Md.1979) ("Had plaintiff actually complied with Crown's request and *then* showed that his sales volume remained below the minimum, he would be in a far better position before this court.").

**11.** Although Mobil continually requested plaintiff to comply with the hours provision of the lease, other than the three experiments for three-week periods, plaintiff did not attempt to comply with the lease, nor show defendant why he could not comply. Plaintiff's efforts cannot be seen to constitute a good faith effort within the meaning of § 2802(b)(2)(B).

**12.** Likewise, clause 7 of the lease agreement requires plaintiff to maintain the premises in a clean manner. *See, supra,* note 3.

**13.** For the sake of brevity, the Court will not discuss all the evidence which showed that plaintiff did not fulfill his duty to operate the station in a clean manner. It is sufficient to state that the evidence documents a chronic and severe cleanliness problem.

**14.** Defendant has this right pursuant to clause 7(d) of the lease. *See, supra,* note 3.

**15.** Mobil's system is to give marketing representatives certain territories and stations with-

representatives gave plaintiff several specific lists of conditions that the plaintiff had failed to remedy in anticipation of a regional inspection by Mobil supervisors. Although plaintiff never expressly refused to comply with defendant's requests, he only made, at best, superficial efforts to improve the appearance of the station. Such efforts do not satisfy the requirements of § 2802(b)(3)(C). *See Weisenburger v. Amoco Oil Co.,* 534 F.Supp. 673, 674–76 (D.N.D. 1982). The degree of plaintiff's lack of cooperation is revealed in the following incident. Mobil's representatives asked plaintiff many times to remove an unsightly pile of old tires from behind the station in preparation for a regional inspection. Plaintiff repeatedly told the representatives that he would move the tires, but never did. The representatives were finally forced to obtain a truck and haul the tires away themselves. This example typifies plaintiff's attitude with respect to the cleanliness and appearance requirements.

The fundamental problem from which the grounds for nonrenewal derive is plaintiff's apparent desire to run "Avi's" station the way he saw fit, and not to operate a Mobil station. The plaintiff was more interested with and concerned about his repair business than complying with his franchise agreement. The PMPA was not intended to insulate these kinds of expectations and desires on the part of franchisees.

## IV. PLAINTIFF'S ALLEGATIONS OF PRETEXT

■ Plaintiff claims that the claimed grounds for nonrenewal are a sham to conceal Mobil's true motivation, to drive

plaintiff from the station so it can convert the station into a "gas & snack" operation. As mentioned, the PMPA requires Mobil to either obtain plaintiff's consent to the tearing down and reconstruction of the station or offer the station for sale to plaintiff. 15 U.S.C. § 2802(b)(3)(D)(i)(II). Since plaintiff refused his consent, according to plaintiff, defendant has trumped up sham grounds for nonrenewal in order to be able to convert the station without offering it for sale to plaintiff.

Although there is evidence suggesting that Mobil desired to change the station into the more profitable "gas & snack" configuration despite plaintiff's refusal to consent, plaintiff's unilateral actions in violation of the lease agreement are not excused by merely alleging a pretext for nonrenewal. *See Crown Central Petroleum Corp. v. Waldman,* 515 F.Supp. 477, 485 (M.D.Penn. 1981); *Malone v. Crown Central Petroleum Corp.,* 474 F.Supp. 306, 311 (D.Md.1979). Plaintiff's continual breach of the hours provision of the lease and of his duty to maintain the station in a reasonably clean and safe manner, are ample grounds for defendant not to renew the franchise agreement under the PMPA. The fact that nonrenewal suggests other motives or purposes of Mobil, does not prevent Mobil from exercising its rights under the Act.[16]

## V. CONCLUSION

Mobil has shown that its nonrenewal of the franchise agreement with plaintiff is permissible under the PMPA. Plaintiff's continual violation of the hours of operation provision of the lease constituted a failure

---

in those territories to be their responsibility. The marketing representatives then tour each station in their area to ensure the quality of the marketing of Mobil products. As a result, marketing representatives are continually in contact with the stations and regularly visit each station.

**16.** The plaintiff's assertion of sham is weakened by the fact that defendant does not own the real estate in question and its lease will expire shortly. In its decision as to whether to attempt to purchase the real estate at this valuable location, a critical factor is the profitability

of the station. Defendant has determined that a gas and snack station would have the greatest profit potential (a determination with which this Court has, nor can have, no quarrel). On the other hand, plaintiff is more interested in and committed to his foreign auto repair business and the impression given is that gas and oil sales are merely an accommodation, and his equivocal statements as to operating a gas and snack station himself are belied by that interest and commitment. In short, while defendant may well have other plans or expectations, that does not establish that its nonrenewal was based on sham or pretext.

to comply with a provision which "is both reasonable and of material significance to the franchise relationship" pursuant to § 2802(b)(2)(A), which justified nonrenewal. Moreover, plaintiff's failure to maintain the premises in a clean manner is also a proper ground for nonrenewal under § 2802(b)(3)(C). Therefore, defendant can properly end the franchise relationship with the plaintiff.