Joseph J. MUNNO, Jr.

v.

AMOCO OIL COMPANY.

Civ. No. H–79–187.

United States District Court,
D. Connecticut.

March 27, 1980.

---

Dominic J. Caciopoli, New Haven, Conn., for plaintiff.

Richard M. Reynolds, John B. Nolan, Kenneth W. Ritt, Day, Berry & Howard, Hartford, Conn., for defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BLUMENFELD, District Judge.

This is an action brought by Joseph Munno a franchisee-lessee gasoline dealer, against Amoco Oil Company ("Amoco") his franchisor-lessor, in which Munno claims that the franchisor is illegally refusing to renew his lease. The plaintiff's claims arise under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et seq. ("PMBA"),[1]

---

1. At the hearing on this motion the plaintiff's attorney indicated that the case involved violations of Connecticut state law as well as violations of the PMPA. However, in spite of numerous invitations the plaintiff has failed to set forth his claimed violations with sufficient specificity to enable this court to consider them. Claims arising under Connecticut's non-renewal and termination statutes need not be considered in any case since, to the extent that they differ from the federal statutes, the Con-

and this court has jurisdiction under 15 U.S.C. § 2805 and 28 U.S.C. § 1332. Defendant Amoco has filed counterclaims in which it seeks back rent and possession of its service station. Jurisdiction to entertain these compulsory counterclaims is properly found under Fed.R.Civ.P. 13(a). Ruling on Plaintiff's Motion to Dismiss Counterclaim, Nov. 16, 1979.

Amoco is a major gasoline distributor which sells its product, in part, through service stations operated by franchisee dealers. Generally, these stations are owned or leased by Amoco and then leased or subleased to its dealers. Throughout the 1960's and early 1970's the rent charged to dealers was based on the number of gallons of gasoline which they sold. However, with the advent of the 1973–1974 Arab oil embargo and the general tightening of supply, maximizing gasoline sales became less of a concern to Amoco than obtaining a fair return on its real estate investments. Consequently, Amoco decided to change its lease agreements so as to provide for a flat cash rental in an amount based on a formula which took into account the base historical rent and the current occupancy cost.[2]

This formula was arrived at in consultation with various Amoco dealer organizations and now is applied nationwide to Amoco's 6500 lessee-dealers. There is no question that it is being applied uniformly nor is it possible, because of the nature of the formula, to use it to discriminate in favor of or against any given franchisee in figuring his rent.

On May 31, 1978, Joseph Munno's lease for his Middletown service station expired. Amoco offered him a four-year lease which was the same as his previous lease in all relevant respects except that the amount of the monthly rent payment was increased in accordance with the new formula.[3] Mr.

---

necticut statutes are expressly preempted by the PMPA. 15 U.S.C. § 2806(a).

One issue, not raised by either party, merits a brief discussion. Under the well-reasoned opinion of Judge Clarie in *Ted's Tires Service Inc. v. Chevron U.S.A. Inc.*, 470 F.Supp. 163 (D.Conn.1979) the terms of the PMPA are inapplicable where the failure to renew a franchise relationship occurred prior to the effective date of the PMPA, June 19, 1978.

As is explained at greater length below, Munno's lease expired on May 31, 1978, and no agreement was ever reached on a subsequent lease. However, it was not until September of 1978 that notice was sent to Mr. Munno indicating that Amoco expected to terminate the franchise relationship as of January 2, 1979.

The PMPA provides:

"(14) The terms 'fail to renew' and 'nonrenewal' mean, with respect to any franchise relationship, a failure to reinstate, continue, or extend the franchise relationship—

(A) at the conclusion of the term, or on the expiration date, stated in the relevant franchise; [or]

(B) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date . . . ."

*15 U.S.C. § 2801(14)(A), (B).*

In spite of the fact that on May 31 the parties were unwilling to renew the lease either as it had been or as it was proposed, they are deemed under Connecticut law to have agreed to a month-to-month tenancy commencing in June of 1978. *Kligerman v. Robinson*, 140 Conn. 219, 221, 99 A.2d 186 (1953). Thus, at this time there was no failure to renew the relationship; Amoco continued to supply Munno with products and continued to treat him as one of its dealers. Failure to renew the franchise relationship can be said to have first occurred at the conclusion of the December term, well after the effective date of the PMPA, and therefore the PMPA terms apply. *Cf. Walters v. Chevron U.S.A., Inc.*, 476 F.Supp. 353, 354–45 (N.D.Ga.1979).

**2.** The actual formula worked as follows:

X = 1.05 x Avg. yearly rent between 1972 and 1974

Occupancy costs = Cost of maintenance + real estate and property taxes + depreciation

Y = The greater of the Occupancy cost or X

(Thus Y would equal either a 5% increase over the "base historical rent" or an amount which would cover depreciation, maintenance repairs to the fixtures installed by Amoco, and taxes on the property, whichever amount was greater.)

Z = 1.15 x 1976 yearly rent

Y would be the new rental charge, but only up to a limit of the amount specified as Z.

**3.** Apart from the rent provision the only other change in the lease was the "term." Instead of having a one-year term as specified in the previous lease, the lease offered by Amoco was to run for four years. Plaintiff has not complained about this extended term, and the evi-

Munno, through his attorney, declined to sign the new lease and indicated that he objected to its terms. He remained on the premises, and Amoco continued to supply him with its products. On September 11, 1978, Amoco provided Mr. Munno with the notice required under the PMPA indicating that the "lease with Amoco is terminated effective January 2, 1979." January came and went, and Mr. Munno still refused to quit the premises. Consequently, in February of 1979 Amoco instituted a summary process action in state court in order to have Mr. Munno evicted. Later that month plaintiff filed a complaint in state court alleging that Amoco's actions were in violation of the PMPA. Through a series of complicated procedural maneuvers, not relevant here, these issues have now been removed to federal court.[4] The parties have submitted briefs and exhibits and have presented live testimony, all of which has been considered in ruling on this motion.

It is beyond dispute that Amoco's decision to increase the amount of rent charged was made with subjective "good faith" and in the "normal course of business." There has been no suggestion of a bad motive or of a subterfuge aimed at driving the plaintiff from the market. While Amoco is admittedly unwilling to negotiate the amount of the monthly rent, its explanation belies any claim of bad faith. Amoco established that its other New England dealers have accepted revised rents based on the new formula, and it is concerned that if it makes an exception for the plaintiff it may be exposed to · liability, presumably under the Robinson-Patman Act, 15 U.S.C. § 13.

Amoco has offered to renew its franchise with the plaintiff if he signs the new lease and pays the outstanding rental charges due. Moreover, plaintiff's own expert in service station management referred to the formula as "excellent" from the standpoint of both the dealer and the oil company and refused to "believe [that Amoco] would come out intentionally and operate in bad faith."

However, construing all facts in favor of the plaintiff, as this court must on the defendant's motion for summary judgment, *Ambook Enterprises v. Time, Inc.*, 612 F.2d 604, 611 (2d Cir. 1979), it is possible that a jury might find that the effect of applying the Amoco formula to the plaintiff's station would produce unreasonably harsh results. The new rental figure represents a 200–300% increase over the old rent. Furthermore, Mr. Munno testified that this increase comes at a time when his gallonage is slipping, and he is facing competition from a nearby cut-rate gasoline station. Mr. Munno contends that the increase in rent will drive him from business. While there was no evidence produced at the hearing on this motion which would support Mr. Munno's claim, it is possible that he might produce some such evidence in the event of a trial.

Thus the question for the court on summary judgment is clear. If under the PMPA proposed changes in the lease are to be tested against a subjective good faith standard, the defendant is entitled to summary judgment. If instead the test is "reasonableness," summary judgment is inappropriate.

Section 102(b)(1) of the PMPA, 15 U.S.C. § 2802(b)(1) permits a franchisor such as Amoco to terminate or fail to renew its franchise if after appropriate notice "such nonrenewal is based upon a ground described in paragraph (2) or (3)." Paragraph (3) provides in part:

"For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

dence produced at the hearing suggests that Amoco might have been willing to accommodate him if he had indicated that he desired a shorter lease.

4. In fact, only plaintiff's complaint under the PMPA was removed to federal court. The defendant then filed its counterclaim for possession in the removed matter and withdrew its action for summary process in state court. Thus, all of the issues previously before the state tribunal are now presented to this court.

(i) such changes or additions are the result of determinations made by the franchisor in *good faith* and in the normal course of business; and

(ii) such failure is not" the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship."

15 U.S.C. § 2802(b)(3)(A) (emphasis added). Plaintiff maintains that the words "good faith" as they are used in this statute must be read to mean "objective good faith" which, he claims, involves questions of the reasonableness of the rent as applied to the franchisee. Defendant, on the other hand, argues that all that it is required to show under the statute is that it acted without impermissible motives or objectives.

Where a statute is to be construed, the object of the court is to ascertain the congressional intent and to give effect to the legislative will. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 607–08, 99 S.Ct. 1905, 1910–1911, 60 L.Ed.2d 508 (1979); *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). Proper construction requires that the court consider the terms of the statute in light of the mischief the statute was intended to remedy. *Liberation News Service v. Eastland*, 426 F.2d 1379, 1383 (2d Cir. 1970).

■ The legislative history behind this section of the PMPA establishes that Congress *was concerned with abuses of the* franchisor-franchisee relationship.[5] Because of the vast disparity in bargaining power between the parties, the franchise relationship frequently amounted to a contract of adhesion unilaterally imposed on reluctant dealers by an all-powerful distributor. The legislature history also documents Congressional concern over the way in which franchisors could force unwanted modifications of the agreements on dealers by threatening to terminate the franchise

relationship or by threatening to fail to renew the relationship when the existing contract expired.[6] Consequently, Congress decided to regulate and limit those circumstances under which a franchisor could terminate its relationship with the franchisee.[7]

However, because of the potential for sham determinations—determinations actually based on impermissible motives but outwardly justified in terms of the statutory requirements—Congress was also moved to consider additional protection for the franchisees.

■ Two proposals were considered. An early draft of the statute contained the following language permitting nonrenewals where

"the franchisor and the franchisee fail to agree *to reasonable changes or additions* to the provisions of the franchise, unless such failure is the result of the franchisor's insistence upon such changes or additions for the primary purpose of preventing the renewal of the franchise relationship . . . ."

H.R. 130, 95th Cong., 1 Sess. (1977) *reprinted in* Petroleum Marketing Practices; Hearings Before the Subcomm. on Energy and Power of the House Comm. on Interstate and Foreign Commerce on H.R. 130 *et seq.*, 95th Cong., 1st Sess. 11–12 (1977) (emphasis added). After hearings on the question, however, the "reasonableness" test was rejected, and a second test—a "good faith" test—was adopted. "Good faith" clearly referred to subjective intent:

"At this point it is appropriate to note that considerable debate has focused upon recognition of so-called 'reasonable business judgments' of the franchisor as grounds for termination or non-renewal. This standard has not been adopted by the committee. Instead, a two-fold test has been utilized to judge certain specified determinations including that of market withdrawal.

---

5. *See generally* Senate Report No. 95–731, 95th Cong., 2d Sess. ("Senate Report"), 15–19, 29–43, *reprinted in* [1978] U.S.Code Cong. and Admin.News, pp. 873, 873–77, 887–901.

6. Senate Report at 18.

7. 15 U.S.C. § 2802.

"One test is whether the determination was made 'in good faith'. This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made 'in the normal course of business'. Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself." [8]

Senate Report No. 95–731, 95th Cong., 2d Sess. ("Senate Report"), 37 *reprinted in* [1978] U.S.Code Cong. and Admin.News, pp. 873, 895–96.

Elsewhere, the same Senate report indicates that the good faith requirement would "preclude the franchisor from basing nonrenewal upon any failure to agree to changes or additions to the provisions of the franchise which are imposed in an [*sic*] discriminatory manner." Senate Report, *supra*, at 35, U.S.Code Cong. & Admin.News 1978, p. 893.

In essence, then, the legislative history suggests that courts have been directed to look to the franchisor's intent rather than to the effect of its actions. If it is only using proposed changes to the lease to disguise an illegal attempt to discriminate against the franchisee and thereby drive him from business, the court is empowered to interfere. If, on the other hand, a good faith application of a rental formula operates unreasonably in a particular case, the dictates of the marketplace alone will govern the transaction. This interpretation is completely in accord with the perceived abuse which Congress sought to rectify.

This interpretation is also in accord with the limited case law which considers this question. In *Pearman v. Texaco, Inc.*, 480 F.Supp. 767 (W.D.Mo.1979), the court considered the plaintiff's motion for a preliminary injunction. In order to issue such an injunction under the PMPA, plaintiff's challenge to Texaco's claim of "good faith" nonrenewal would have to have presented a "sufficiently serious question going to the merits to make the question a fair ground for litigation." As is claimed in this case, the evidence presented in *Pearman* established that the proposed rent term would substantially affect the dealer's opportunity to earn a profit at the station. Moreover, unlike this case, there was also evidence of prior disputes between the parties for which the company might, arguably, have been seeking to retaliate. Notwithstanding these findings of fact, the court declined to grant the preliminary injunction.

"Plaintiff further challenges Texaco's failure to give weight to the gasoline allocation of each station in determining a fair rental rate. If Texaco had given consideration to this factor in determining the rent for some stations but not plaintiff's it might be some evidence that the rental changes were not requested in good faith in the normal course of business. However, uncontroverted evidence was presented that this had never been a factor considered by the company. . . . [T]he Court is not prepared to find that allocation should have been considered by the company. Additionally, the Court does not believe that the Petroleum Marketing Practices Act was intended to authorize this Court to substitute its judgment as to what factors should or should not be considered in determining rental rates. Where rental changes are made in good faith, in the normal course of business and not for the purpose of preventing the renewal of the franchise relationship, the mere fact that the parties or the Court would have made a different business judgment or base that judgment on different factors is immaterial."

*Pearman, supra*, at 772.

With less discussion, the court in *Kesselman v. Gulf Oil Corp.*, 479 F.Supp. 800

---

8. The language referred to in the text is discussing the meaning of "good faith" as that phrase is found in 15 U.S.C. § 2802(b)(3)(D).

There is no reason to suspect, however, that the discussion is not equally applicable to 15 U.S.C. § 2802(b)(3)(A).

(E.D.Pa.1979) (Broderick, J.), reached the same conclusion. There Gulf had applied a rent formula which, unlike Amoco's formula, allowed for some flexibility in setting the rates. Nonetheless, in the face of plaintiff's objections that he could not afford to do business at the new rate, the court still failed to find a "serious question" which would constitute a "fair ground for litigation." Thus, both the legislative history and the limited number of cases construing the PMPA[9] support the conclusion that subjective good faith, i. e., a "good heart" without evil intent, is all that the statute requires of franchisors.

◼ In support of his alternative reading, Mr. Munno advances two arguments. First, he claims that the provisions of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 et seq., and the regulations promulgated thereunder, 10 C.F.R. 210.1 et seq., somehow mandate an examination of the reasonableness of the rent structure created by Amoco. Given the fact that these statutes and regulations are totally unrelated to the PMPA, his argument is wide of the mark. It is true that 10 C.F.R. 210.62 requires gasoline suppliers to maintain the "normal business practices" which were in effect during the base period from November 1, 1977 through October 31, 1978, but only with respect to the "allocated product." Nothing in the statute or regulations requires rental amounts or rent structures for leased premises to remain fixed. Moreover, the very rent structure and amount challenged here was in effect dur-

ing the base period and so Amoco, in fact, has not modified its business practice. Plaintiff's remaining arguments based on a construction of the Emergency Petroleum Allocation Act are equally devoid of merit.

Second, Munno argues that a subjective approach to good faith is contrary to the intent of the drafters because it provides too little protection to franchisees. Claiming that it is virtually impossible to rebut a self-serving declaration of good faith by company officials, he argues that to allow the permissibility of non-renewal to turn on the subjective intent of the company would so dilute the protection afforded franchisees as to render it ineffective. This argument fails for two reasons.

◼ First, it presumes that Congress intended to provide the maximum amount of protection to franchisees without regard to the potential costs to the franchisors. In fact, the legislative history reflects a sensitivity to the legitimate needs of both the franchisees and the franchisors.[10] On balance, Congress concluded that the added protection which a "reasonable effect" test would provide to franchisees was not worth the costs associated with drawing the courts into the role of a rate-review agency.

◼ The second fallacy lies in Mr. Munno's understanding of the nature of the "subjective good faith" test. Contrary to his assumption, subjective good faith, like intent, need not be proved with direct evidence of an actual state of mind.[11] Thus, in

---

9. *Sexe v. Husky Oil Company*, 475 F.Supp. 135 (D.Mont.1979), appears to be contrary to this position although its brevity makes any such conclusion speculative. To the extent that the court interprets the "good faith" provision so as to require an examination of the impact of a rent formula on individual dealers, its conclusion does not appear to be based on any examination of legislative history or case law and seems at odds with the more fully reasoned opinions.

10. *See, e. g.*, Senate Report at 19, U.S.Code Cong. & Admin.News 1978, p. 877.

"Legislation in this subject area requires recognition of the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based

upon certain actions of the franchisee, including certain failures to comply with contractual obligations or upon certain changes in circumstances. Particularly important is that legislation dealing with this subject recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences."

11. "The presence of . . . intent is rarely susceptible of direct proof, and must instead be established by legitimate inferences from circumstantial evidence." *United States v. Sullivan*, 406 F.2d 180, 186 (2d Cir. 1969).

"It is fundamental that the issue of . . . intent is usually a question of fact for the jury

order to establish bad faith the dealer need not coax a confession of impermissible motive from the company officials. Rather, objective evidence, such as inter-office memos or evidence of prior disputes between the parties, could constitute circumstantial proof tending to show bad faith on the part of the company.[12] When the liberal discovery permitted under the Federal Rules of Civil Procedure is coupled with the fact that the PMPA places the burden of proving good faith on the non-renewing franchisor, 15 U.S.C. § 2805(c),[13] it cannot be said that a subjective approach provides inadequate protection to franchisees.

"Summary judgment for the defendants can be sustained in such a case if but only if the reviewing court is satisfied that a properly instructed jury, giving full weight to plaintiff's evidence, drawing every reasonable inference in its favor, and subjecting defendants' evidence to a critical eye, could not rationally have found that plaintiff was entitled to any relief." *Ambook Enterprises v. Time, Inc., supra*, at 611. Such is the case here. Judgment in the plaintiff's case shall enter for the defendant on its motion, and it is

So ordered.

Judgment on the defendant's counterclaim shall enter for the defendant on its motion for summary judgment.

SETTLE ORDER ON NOTICE.[14]

to decide. It is seldom susceptible of proof by direct evidence and in most cases must be proved by inference from the facts and circumstances of the particular case." *Van Nattan v. United States*, 357 F.2d 161, 162 (10th Cir. 1966).

12. In fact, in cases where rent is not set pursuant to a cost analysis formula applied uniformly to all dealers, grossly unreasonable effects might be some circumstantial evidence of bad faith. This, of course, is quite different from suggesting that unreasonableness is the standard against which to test proposed changes to the lease. In a case, such as this one, which involves a rent formula applied nationwide, the so-called "unreasonable effect" on Mr. Munno has no probative value on the question of Amoco's subjective good faith.

13. 15 U.S.C. § 2805(c) provides:

"In any action under subsection (a), the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 102(b) or 103 [15 U.S.C. §§ 2802(b) or 2803], and, if applicable, that such franchisor complied with the requirements of section 102(d) [15 U.S.C. § 2802(d)]."

14. The defendant shall serve a proposed order with respect to its counterclaim on the plaintiff. Within five days after receipt of the defendant's proposed order the plaintiff may, if he deems it advisable, serve an alternative proposal on the defendant. This court shall then issue its final order in this matter.