**David P. VALENTINE,**
**Plaintiff/Counterdefendant,**

v.

**MOBIL OIL CORPORATION, a New York corporation,**
**Defendant/Counterclaimant.**

**No. CIV 83–1651 PHX EHC.**

United States District Court,
D. Arizona,
Sixth Division.

Nov. 9, 1984.

Ronald W. Meyer, Phoenix, Ariz., for plaintiff/counterdefendant.

N. Warner Lee, Ryley, Carlock & Applewhite, Phoenix, Ariz., for defendant/counterclaimant.

## ORDER

CARROLL, District Judge.

On August 22, 1983, Plaintiff David P. Valentine (Valentine) commenced this action seeking a prohibitory and mandatory injunction against Defendant Mobil Oil Corporation (Mobil). Valentine seeks a preliminary injunction against Mobil enjoining it from nonrenewing or terminating Valentine's franchise, (including service station facilities leased from Mobil) and from commencing demolition of the service station facilities. He also seeks a declaratory judgment that the terms of a Redevelopment Rider (rider) attached to Mobil's 1983 renewal agreement is a provision which materially alters the leased premises thereby requiring Mobil to make a bona fide offer to Valentine for him to purchase such premises pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. (PMPA).

At issue here is Mobil's Motion for Summary Judgment argued November 28, 1983. The Court took the motion under advisement and heard further argument on Mobil's Motion to Reconsider and For In Camera Inspection on February 3, 1984. Pursuant to the Court's order, Mobil has submitted, and the Court has considered, numerous documents *in camera*. Additional Mobil documents have been submitted to Valentine under protective orders as to disclosure. Valentine has not sought leave to utilize any of these materials in opposition to the summary judgment motion. The primary issue before the Court is whether Mobil complied with the requirements of the PMPA in the nonrenewal of its franchise relationship with Valentine. For reasons discussed more fully below, Mobil's Motion for Summary Judgment is granted.

*Factual Background*

Valentine has been a dealer of Mobil's branded products for approximately 10 years. On May 30, 1980, Mobil entered into a two-part agreement with Valentine: (1) a service station lease, and (2) a retail-dealer contract (franchise agreement). The terms of both agreements ran from September 1, 1980 through August 31, 1983. Prior to September 1, 1983, a franchise relationship within the meaning of and as defined by the PMPA, existed between Valentine and Mobil.

On April 22, 1983, Mobil submitted a renewal franchise agreement to Valentine which included changes or additions regarding (1), rental (2) hours of operation, and (3) a Redevelopment Rider authorizing possible alteration of the physical structure and functions of the service station. The provisions of the rider would allow Mobil to add a "sales room profit center" (snack area) and to restructure the station to a pump only station (pumper). A pumper has only self-serve gas islands and no other service bay areas. Mobil later advised Valentine that it had no present intention to convert Valentine's station to a pumper (Exhibit E, Motion for Summary Judgment). Nevertheless, the rider remains a part of the new franchise agreement. The pertinent language of the rider is as follows:

> Tenant understands that Landlord contemplates making a substantial redevelopment of the premises which may include a change in configuration, and may include the elimination of the service bays. Tenant agrees and understands ... it is solely within the discretion of Landlord whether any such redevelopment will be made, as well as the nature and extent of any redevelopment.

(Exhibit C, Motion for Summary Judgment).

On April 27, 1983, Valentine rejected the above offer, disagreeing with all three items. Valentine has submitted an affidavit with his response to the Motion for Summary Judgment which states that he would have signed the renewal but for the

rider. Mobil and Valentine failed to agree to the changes and additions to the provisions of the existing franchise. On May 25, 1983, Mobil sent a Notice of Nonrenewal of Franchise Relationship by certified mail, return receipt requested, to Valentine, which complied with the notice requirements under the PMPA, 15 U.S.C. § 2804.

The parties agree that Valentine has developed goodwill in his business by performing automotive service and repair work.

In addition to the renewal issues raised above, Valentine has made claims against Mobil for breach of lease, negligence and for failure to make timely repairs to his service station in violation of the PMPA. Valentine has also sought damages, exemplary damages, reasonable attorneys' fees, and costs and expenses.

Further, Mobil has counterclaimed against Valentine seeking a declaratory judgment stating that Mobil has complied with the requirements of all applicable laws in its franchise and all relationships between them are terminated. Mobil also seeks judgment against Valentine requiring him to immediately vacate the service station premises and return all of Mobil's property to Mobil. Mobil seeks reasonable attorneys' fees and costs.

*Contentions of the Parties*

The parties dispute the grounds and motivation upon which the nonrenewal of the franchise relationship is based. Mobil contends that 15 U.S.C. § 2803(b)(3)(A) governs. It concedes that the rider to the new lease package offered to Valentine contains changes or additions to the provisions of the franchise but that nonrenewal was based upon the failure of the parties to agree to these changes as provided by § 2802(b)(3)(A). The issue therefore is whether the elements of that section have been met. Specifically, grounds for the nonrenewal of the franchise relationship under this section include:

1. Whether, in the renewal agreement, proposed changes or additions to provisions of the franchise were made by Mobil in "good faith", and

2. Whether such changes or additions were made "in the normal course of business", and

3. Whether a failure to agree to renewal is the result of Mobil's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship, i.e., mere pretext or sham.

Mobil argues that the proposed altered terms are not evidence of either a discriminatory motive or a sham or pretext to avoid renewal. It contends the rider has not discriminatorily singled out Valentine, but us uniformly included in all its renewals and, therefore, is in the normal course of business and offered in good faith.

Mobil asserts that its decision to incorporate the rider into the new franchise agreement was based on its policies—permissible under Congressional intent of the PMPA—to allow Mobil's management flexibility to adjust to changing market conditions and is critical to permit it to remain competitive. It is Mobil's policy to require a rider to every new and renewed franchise or lease, other than for stations targeted for divestiture. Mobil presently has selected seven stations in the Phoenix Key Market area for conversion to pumper stations, but maintains that Valentine's station is not one of those at this time. His station is one of 26 stations selected for a partial self-serve conversion to add a salesroom profit center without elimination of full-service pumps or backroom work capabilities.

Even though Mobil does not now intend to convert Valentine's station into a pumper, it reserves the right to do so by the language of the rider which it still requires Valentine to sign. The affidavit of M.D. DiMezza, resale marketing manager, Western region of Mobil, states that when and if Valentine's station is converted to a pumper "depend[s] upon changing economic conditions and customer preferences." (Affid. at page 4). Mobil further contends that its policy of requiring the rider predates the Marketing Analysis and Planning System

(MAPS) study which has been identified by Valentine as a key document to proving Mobil's good faith under the PMPA requirements. It is an in-depth survey of 57 key market areas, including the Phoenix Market area. This study details various data described by Mobil as highly "sensitive" given it includes investment strategies, methods of pricing, profitability, estimates of competitor's profit margins and other information. The Court has reviewed various documents *in camera* and Valentine has received portions of MAPS and other information pursuant to a detailed protective order stipulated to by the parties.

Valentine contends that § 2802(b)(3)(D) is applicable here. This section permits franchise nonrenewal involving leased marketing premises by the franchisor, if such decision is made in good faith and in the normal course of business. It also requires that the franchisee be afforded the opportunity to purchase the property where the franchisor elected not to offer a renewal franchise because the franchisor had determined:

to materially alter, add to, or replace such premises, or

that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the provisions of the franchise which may be acceptable to the franchisee.

A further requirement under this section is that the franchisor cannot have made either of the foregoing determinations for the purpose of converting the premises to operation by employees or agents of the franchisor for such franchisor's own account.

Valentine argues that Mobil's decision not to renew the lease was (a) not made in good faith, and (b) the prospective change to a pumper is to "materially alter, add to, or replace such premises." Ergo, since Valentine was not afforded the opportunity to buy the premises, the franchise agreement could not be terminated.

Essentially, Valentine's position is that Mobil knew when it offered the renewal that Valentine could not survive financially under the terms in the rider and would therefore be forced to reject the renewal. He reasons that Mobil only made the offer to give the appearance of good faith negotiation under § 2802(b)(3)(A), but that in reality it was a mere pretext to permit Mobil to circumvent the requirement under § 2802(b)(3)(D) to offer Valentine a right to purchase the station. Mobil was assured of Valentine's failure to agree he argues because Mobil knew he would subject himself to virtual financial ruin were he to consent to terms which would eliminate his goodwill built up over a 10-year period, eliminate his income from repairs done in his backroom, eliminate his service abilities coincident to a full-service station, and render his position tantamount to a "cashier". (Response to Motion for Summary Judgment, at p. 6).

Alternatively, Valentine argued in November, 1983 that if § 2802(b)(3)(A) is applicable, the MAPS study and other discovery potentially would show that Mobil used the rider as a pretext to gain nonrenewal and that the rider is a "tool for preventing the renewal of a franchise relationship" (Response to Motion for Summary Judgment, p. 3). Therefore, Valentine argued that there is a material issue of fact as to whether Mobil meets the requirements of "good faith" and "in the usual course of business" which preclude granting summary judgment for Mobil. He argues that given Mobil's renewal terms will have such draconian financial consequences to him—without his providing any financial analysis—it cannot be considered a good faith renewal proposal. As noted, Valentine has not supplemented his earlier affidavit since receiving the additional discovery.

Mobil argues that § 2802(b)(3)(D) cannot apply to the facts here given it made an offer of renewal to Valentine in good faith and in the normal course of business, but the parties failed to agree pursuant to § 2802(b)(3)(A). Valentine argues that § 2802(b)(3)(D) is controlling because it can

be inferred from the onerous consequences of the rider that it was Mobil which determined not to renew the franchise.

*Analysis*

The primary issues are as follows:

1. Whether 15 U.S.C. § 2802(b)(3)(A) or § 2802(b)(3)(D) governs.
2. Whether, if § 2802(b)(3)(A) governs, the parties failure to agree to the proposed changes or additions to the franchise agreement are the result of Mobil's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship as defined by § 2802(b)(3)(A).

The first issue presented here is addressed by the court in *Baldauf v. Amoco Oil Company,* 553 F.Supp. 408 (W.D.Mich. 1981), aff'd, 700 F.2d 326 (6th Cir.1983). In upholding nonrenewal of a franchise relationship involving a pumper conversion under § 2802(b)(3)(A), the court stated:

> [Here] Defendant specifically provided Plaintiffs with the opportunity to renew. Therefore, nonrenewal must be based upon the failure to agree requirement of subsection (A) rather than on the franchisor's decision not to renew for reasons mentioned in subsection (D). Correspondingly, there is no right of first refusal under these circumstances.

*Id.* at 414; *see, e.g., Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1220. (7th Cir.1982).

Valentine argues he was presented with a *fait accompli* in that Mobil's offer of renewal was in fact no offer due to the rider's severe financial consequences to him thereby assuring Mobil of nonrenewal at the moment the offer was made. He argues that the terms of the rider "forced Valentine to give up this legal right [to the franchise] and terminated Valentine when he refused to give up this legal right", that this therefore places the partiender the requirements of § 2802(b)(3)(D), and that Valentine must be given a right to purchase the premises (Joint Pretrial Order, at p. 6).

The Court is persuaded that the reasoning in *Baldauf* is correct on this point. The plain meaning of the two subsections demonstrates that where a franchisor makes a renewal offer, as opposed to independently and unilaterally determining to non-renew, § 2802(b)(3)(A) applies, not § 2802(b)(3)(D).

Valentine further argues on this point that to construe the two subsections as Mobil does "effectively eliminates the 'right to purchase section' from the [PMPA]" (Response to Motion for Summary Judgment, at p. 13).

> In every instance where an oil company would want to convert the premises, materially or substantially change the premises, or sell the premises, the oil company would merely add a rider to the Lease which would give it the right to do one or all of the above factors. If the dealer did not agree to those provisions of the Lease, the oil company would merely not renew the Lease on the basis that they could not agree to terms and conditions as provided in the "negotiations section" [§ 2802(b)(3)(A)].

(Response to Motion for Summary Judgment, at p. 13).

Valentine's reasoning is unpersuasive in light of the factual context in *Roberts v. Amoco Oil Company,* 740 F.2d 602, 603 (8th Cir.1984). There the court dealt with a question of first impression as to whether a bona fide offer to sell the service station premises under the PMPA must include the gasoline pumps, tanks, and other related equipment. The franchisor notified the franchisee that it did not intend to renew his lease when it expired because it intended to sell the premises, but that it would make an offer to sell the station to the franchisee first. The franchisor's decision not to renew was therefore not at issue and the court proceeded to rule premised on the nonrenewal by the franchisor pursuant to § 2802(b)(3)(D)(iii).

This Court is persuaded that application of § 2802(b)(3)(D) is precluded by the fact that Mobil offered renewal to Valentine. This assumes Mobil acted in good faith and in the normal course of business, also requirements under this subsection and discussed below.

Resolving the second issue is the more challenging. As the court in *Baldauf* concluded, the legislative history reflects that Congress intended that franchisor nonrenewal decisions meet a two-pronged test under § 2802(b)(3)(A):

> [C]onsiderable debate has focused upon recognition of so-called 'reasonable business judgments' of the franchisor as grounds for termination or non-renewal. This standard has not been adopted by the committee. Instead, a two-fold test has been utilized to judge certain specified determinations including that of market withdrawal.
>
> One test is whether the determination was made 'in good faith'. This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made 'in the normal course of business'. Under this test, the determination must have been the result of the franchisor's normal decision making process. These tests provide adequate protection of franchisors [sic] from arbitrary or discriminatory termination or non-renewal, *yet avoid judicial scrutiny of the business judgment itself.* (Emphasis supplied).

*Baldauf v. Amoco Oil Co.*, 553 F.Supp. at 412, quoting *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114 (D.Conn.1980); Senate Report No. 95-731, 95th Cong., 2d Sess. ("Senate Report"), 37 *reprinted in* [1978] U.S.Code Cong. and Admin.News, pp. 873, 895-96. *See Humboldt Oil Co., Inc. v. Exxon Co., U.S.A.*, 695 F.2d 386, 388 (9th Cir.1982) (Congress enacted the PMPA to protect "franchisees from arbitrary or discriminatory termination or non-renewal of their franchises").

Congress attempted to bring equity to the imbalance in the bargaining relationship between producers and dealers and the extent of those goals is recited in a Senate Report:

> The prospect of nonrenewal for *arbitrary or discriminatory grounds* threatens the independence of the franchisee as a competitive influence in the marketplace.
>
> An essential requirement of Federal legislation is that the grounds for termination and non-renewal provided in the legislation not be so broad as to deny franchisees meaningful protections from arbitrary or discriminatory terminations and non-renewals or to prevent fulfillment of the reasonable renewal expectations of franchises.
>
> Legislation in this subject area requires recognition of the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee including certain failures to comply with contractual obligations *or upon certain changes in circumstances. Particularly important is that legislation dealing with this subject recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.* (Emphasis supplied) Senate Report P.L. 95-297, U.S.Code Cong. and Ad.News 873 at 876-77 (1978).

*Baldauf v. Amoco Oil Co.*, 553 Supp. at 415. The court in *Baldauf* concluded that, although the result was harsh, Congress intended to protect the franchisee only from "arbitrary and discriminatory" termination or nonrenewal, and "did not provide a basis to examine the economic impact of an otherwise legitimate business decision by the franchisor." *Id.* at 412.

So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith. Id.

The majority of cases evaluating franchisor decisions under this section of the PMPA require that the franchisor meet a test of "subjective good faith, i.e., a 'good heart' without evil intent." *Munno v. Amoco Oil Co.*, 488 F.Supp. at 1120 (franchisor's decision to require a large rent

increase held permissible under subjective good faith standard without regard to reasonableness of increase); *Bellmore v. Mobil Oil Corp.*, 524 F.Supp. 850 (D.Conn. 1981); *see, e.g., Roberts v. Amoco Oil Co.*, 740 F.2d 602 at 606 for cases cited therein. *Contra, Tiller v. Amerada Hess Corp.*, 540 F.Supp. 160 (D.S.C.1981).

> In essence, then, the legislative history suggests that courts have been directed to look to the franchisor's intent rather than to the effect of its actions. If it is only using proposed changes to the lease to disguise an illegal attempt to discriminate against the franchisee and thereby drive him from business, the court is empowered to interfere. If, on the other hand, a good faith application of a rental formula operates unreasonably in a particular case, the dictates of the marketplace alone will govern the transaction. This interpretation is completely in accord with the perceived abuse which Congress sought to rectify.

*Munno v. Amoco Oil Co.*, 488 F.Supp. at 1119.

The result here might have been different if the Court were permitted to evaluate the good faith test on the basis of objective reasonableness. Legislative intent precludes such consideration.

Here, Mobil's actions clearly coincide with practices contemplated and accepted in the legislative history, which this Court has reviewed independent of the court's conclusions in *Baldauf* and *Munno*. Mobil maintains that its rider is incorporated in all of its new and renewed lease packages. There is no showing that Valentine was treated differently from other dealers. Mobil alleges that the changes and alterations proposed in the rider allow it to "keep pace" with the competition, and provides it with adequate flexibility to adapt to changing market conditions and consumer preferences (Reply to Motion for Summary Judgment, at p. 15). None of the documents submitted by Mobil for *in camera* review by the Court indicate any purpose other than Mobil acting to protect its economic interest. Valentine has failed to direct the

Court's attention to any evidence suggesting a contrary purpose. While Valentine recites differing conclusions as to the Congressional intent regarding the PMPA, he fails to direct the Court to a single portion of legislative history which contravenes any of the above.

In addition, the Court held a preliminary pretrial conference on September 26, 1984 at which time parties were given a period in which to supplement the pending Motion for Summary Judgment with any affidavits or memoranda. The Court instructed the parties that after such filings the motion would be considered submitted. Valentine seeks to supplement his Response to Mobil's Motion for Summary Judgment by adding Exhibit 2 to the deposition of Mr. DiMezza (interoffice memorandum dated December 5, 1982, authored by Mobil employee and distributed to various Mobil personnel). Valentine argues that this document illustrates that the rider was devised solely to circumvent the provision of the PMPA that involves a dealer's right to purchase a station. Mobil contends that the exhibit is merely a memorandum which analyzes how the rider should be implemented to comply with the PMPA, and that it is not devised to circumvent the above provision. This memorandum cannot be reasonably construed in the manner proposed by Plaintiff.

As arguably onerous as these results are to Valentine, Mobil has satisfied the test required by the PMPA given it acted for legitimate business reasons. Any alterations or changes in the terms of renewal were not done as a pretext for nonrenewal. There is nothing in the record from which it can be reasonably inferred otherwise. In the final analysis, Valentine and similarly situated franchisees must seek from Congress any different balancing of the equities between franchisors and franchisees under the PMPA.

Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment is granted as to Counts I and IV of the amended complaint and as to the counterclaim.