BECK OIL COMPANY, INC.; Daryl Becker, d/b/a E.P. Becker, Inc.; V.W. Bowman Oil Co., Inc.; Wabash Independent Oil Co., Inc.; Warfield Oil Co., Inc., Plaintiffs,

v.

TEXACO REFINING & MARKETING, INC., Defendant.

No. 90–3055.

United States District Court, C.D. Illinois, Springfield Division.

May 27, 1993.

Robert T. Hall, Springfield, IL, Gregg R. Potvin, Washington, DC, for plaintiffs.

Steven Nardulli, Springfield, IL, Joseph Girardi, Chicago, IL, for defendant.

## OPINION

RICHARD MILLS, District Judge: ˙

We deal here with the Petroleum Marketing Practices Act.

And the issues are raised by cross-motions for summary judgment.

## I. FACTS

In early 1984, Texaco Inc. purchased Getty Oil Company which had marketed gasoline and other petroleum products under the "Getty" brand name. After the Getty acquisition, Texaco, Inc. reorganized its corporate structure. This resulted in the creation of Defendant Texaco Refining and Marketing, Inc., (TRMI) as a wholly-owned subsidiary of Texaco Inc. to perform the refining and marketing operations associated with the Texaco brand of motor fuels, as well as other petroleum products, at both the wholesale and retail levels.

Plaintiffs V.W. Bowman Oil Co., Inc., Warfield Oil CO. and Beck Oil Co. were Texaco brand distributors who had franchises with Texaco in 1984. Plaintiffs Wabash Independent Oil Co. and Becker Inc. were Getty brand distributors under Getty distributor agreements entered into in 1983. Each of the franchises were for a period of three years. As a result of the merger and Texaco's reorganization, each agreement was assigned to TRMI as of December 31, 1984.

In January 1985, TRMI decided to withdraw from marketing motor fuels at retail in a contiguous area located within the states of Illinois, Wisconsin, Indiana, and Kentucky, and to consequently terminate all franchise agreements whose marketing premises were located in the withdrawal area, effective September 30, 1985. Specifically, the withdrawal area was composed of 69 counties in Illinois, 47 counties in Wisconsin, 88 counties in Kentucky, and 74 counties in Indiana. Initially, TRMI did not withdraw from the five county Chicago metropolitan area because of its national significance; however, when a long term reasonable and economical means of supply for Chicago could not be located, TRMI withdrew from the Chicago area in 1986.

Around March 11, 1985, TRMI sent written notices to the Governors of the states within the withdrawal area notifying them of it's plans. On March 27, 1985, TRMI sent written notices of termination to all of the Texaco and Getty franchisees whose marketing premises were located in the withdrawal area.

Plaintiffs originally filed this action in 1985 as case No. 85–3437 against Texaco, Inc. Thereafter, TRMI was voluntarily substituted for Texaco Inc. as the real party in interest. By agreement, the case was dismissed in 1989; however, Plaintiffs were given six months in which to refile the action.

## II. SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material facts exists, the evidence is to be taken in the light

most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987). "A scintilla of evidence in support of the non-movant's position is insufficient to successfully oppose summary judgment; 'there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Brownell v. Figel*, 950 F.2d 1285 (7th Cir. 1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)).

## III. ANALYSIS

The parties have stipulated that the sole issues to be resolved here are:

1. Whether Defendant's determination to withdraw was made in good faith and in the normal course of business, as required by 2802(b)(2)(E) of the Petroleum Marketing Practices Act (PMPA); and

2. Whether the area withdrawn from by Defendant was a relevant geographic marketing area in which Plaintiffs' marketing premises were located, as required by 2802(b)(2)(E) of the PMPA.

Plaintiff asserts that Defendant's termination of their respective franchises were in violation of the PMPA because the terminations were not made in good faith and in the normal course of business, nor were the withdrawals made from a relevant geographic market.

Defendant contends that it is entitled to summary judgment because: 1) its determination to withdraw was made in good faith and in the normal course of its business; 2) the area Defendant withdrew from was a relevant geographic marketing area; and 3) Plaintiffs' marketing premises were located within the relevant geographic marketing area withdrawn from by Defendant. Defendant states that the decision to terminate was based on three factors: 1) the closing of Defendant's Lawrenceville, Illinois, refinery; 2) the inability of Defendant to economically supply the withdrawal area; and 3) the unreasonable and uneconomical Getty supply

system in the withdrawal area. The Lawrenceville refinery was technologically outdated and by late 1984, the cost of finished gasoline produced there resulted in a $2.00 per barrel loss for each barrel of oil refined. In addition, Defendant did not have another refinery in the location with an efficient means of transporting Defendant's products to the withdrawal area.

The Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 et seq., governs the termination of motor fuel product franchises. Under the PMPA, the following are grounds for termination of any franchise:

> In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if—
>
> (i) such determination—
>
> (I) was made after the date such franchise was entered into or renewed, and
>
> (II) was based upon the occurrence of changes in relevant facts and circumstances after such date;
>
> (ii) the termination or nonrenewal is not for the purpose of converting the premises, which are the subject of the franchise, to operation by employees or agents of the franchisor for such franchisor's own account; ...

15 U.S.C. § 2802(b)(2)(E).

The PMPA was enacted due to Congress' concern with attempts by franchisors to discriminate against a particular franchisee or to extract an unfair concession based upon the franchisor's superior bargaining power. *Winks v. Feeney Oil Co.*, 731 F.Supp. 322 (C.D.Ill.1990). Congress intended to be sensitive to the legitimate needs of both franchisors and franchisees. *Baldauf v. Amoco Oil Co.*, 553 F.Supp. 408 (W.D.Mich. 1981). The PMPA's legislative history illus-

trates Congress' intent concerning the meaning of "good faith" and in the "normal course of business." That history says:

> This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made "in the normal course of business". Under this test, the determination must have been the result of the franchisor's normal decision making process. These tests provide adequate protection of franchisees from arbitrary and discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the courts to determine whether a particular marketing strategy, such as market withdrawal, or the conversion of leased marketing premises to a use other than the sale or distribution of motor fuel, is a wise business decision.

S.Rep. No. 731, 95th Cong., 2d Sess. 37, *reprinted in* 1978 U.S.Code Cong. & Ad. News 873, 896; *Southern Nevada Shell Dealers Ass'n v. Shell Oil Co.*, 634 F.Supp. 65 (D.Nev.1985). Moreover, Congress also recognized "the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." S.Rep. at 19, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 877; *King Service, Inc. v. Gulf Oil Corp.*, 834 F.2d 290, 294 (2d Cir.1987). In fact, the courts have recognized that in an era of increased corporate competition, the major petroleum companies must maintain the freedom to seek greater economic efficiency through corporate acquisitions, mergers, and reorganizations. *May-som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917 (6th Cir. 1989); *Russo v. Texaco, Inc.*, 630 F.Supp. 682 (E.D.N.Y.1986).

■ In essence, the legislative history indicates that courts have been directed to look at the franchisor's intent rather than the effect of its actions. *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114 (D.Conn.1980). Accordingly, the legislative history reveals that a two-fold test must be utilized when determining whether a market withdrawal violates the PMPA. *Munno*, 488 F.Supp. at 1119. One test is whether the franchisor's decision to terminate was made in good faith. *Munno*, 488 F.Supp. at 1119. Good faith is determined subjectively from objective evidence, such as affidavits or studies. *Baldauf*, 553 F.Supp. at 411; *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1223 (7th Cir.1982). The second test is whether the termination was the result of the franchisor's normal decision making process. *Munno*, 488 F.Supp. at 1119.

■ In this case, after the Getty acquisition, Texaco reorganized and reevaluated its operations to determine their efficiency and profitability. The affidavits submitted by TRMI demonstrate concerns about uneconomical distribution methods in the area served by the Lawrenceville refinery. Accordingly, the Court must conclude that TRMI's decision to withdraw was made in good faith and was part of the normal decision making process once TRMI began examining its operations after the Getty acquisition. *See Baldauf*, 553 F.Supp. at 415; *Massey v. Exxon Corp.*, 942 F.2d 340 (6th Cir.1991).

■ Likewise, the Court finds that TRMI withdrew from a relevant geographic marketing area as required by the PMPA. Under the Act, the term " 'relevant geographic market area' includes a State or a standard metropolitan statistical area [SMSA] as periodically established by the Office of Management and Budget." 15 U.S.C. § 2801(16). The act does not state that a relevant marketing area is one of these and nothing else. *Lindner v. Mobil Oil Corp.*, 974 F.2d 1342 (9th Cir.1992). In fact, the legislative history states:

> As a matter of law, it is provided that withdrawal from the entirety of a state or the entirety of a standard metropolitan statistical area will constitute withdrawal from a relevant geographic market area. Withdrawals from less than an entire state or from less than an entire standard metropolitan statistical area may, in view of the marketing operations and size of the franchisor, constitute a withdrawal from a relevant geographic market area for purposes of the title. The purpose of the definition is, therefore, to preclude judicial construction which would require a franchisor to withdraw from a multi-state re-

gion or from more than a standard metropolitan statistical area prior to satisfying the market withdrawal criteria of the title. S.Rep. No. 95–731, at 891. Moreover, as one court has noted, the term "relevant" is not to be narrowly construed; rather it must be interpreted in light of Congress' intent to protect franchisees from arbitrary and discriminatory treatment and in conjunction with the two-fold test previously discussed. *King Service, Inc.*, 834 F.2d at 294.

## IV. CONCLUSION

■ The Court concludes that the withdrawal area in this case was a relevant geographic market area because the counties withdrawn from were supplied by the Lawrenceville refinery, and could not be supplied from exchange agreements with competitors' refineries, or did not otherwise have access to pipelines from TRMI's other refineries. Accordingly, the Court finds nothing arbitrary or discriminatory in TRMI's determination of the relevant geographic market area from which it withdrew.

*Ergo*, Defendant's motion for summary judgment is ALLOWED.

Plaintiffs' motion for partial summary judgment is DENIED.

Case Closed.