**Charles WINKS, Plaintiff,**

v.

**FEENEY OIL CO., INC., Defendant.**

**No. 88–3305.**

United States District Court,
C.D. Illinois,
Springfield Division.

Feb. 21, 1990.

Fred B. Moore, Livingston, Barger, Brandt & Schroeder, Bloomington, Ill., Mark A. LaMantia, Shannon & Johnson, Portland, Or., Gary Persian and Randy V. Thompson, Smith, Persian, MacGregor & Thompson, Minneapolis, Minn., and Richard Farrell, Farrell & Barr, Stamford, Conn., for plaintiff.

Gregg R. Potvin, Southmayd, Powell, Taylor & Bowen, Washington, D.C., and Martin L. O'Connor, Fleming, Messman & O'Connor, Bloomington, Ill., for defendant.

## OPINION

RICHARD MILLS, District Judge:

PMPA revisited.

The Court has before it motions for partial summary judgment filed in the two cases comprising this consolidated action: *Winks v. Feeney Oil, Inc.*, 88–3305, and *Feeney Oil Co., Inc. v. Winks*, 89–3052. (Because the parties are in opposite alignment in the two cases, we shall refer to them as Feeney Oil and Winks, rather than by their respective party designations.)

This case requires us to return to the Petroleum Marketing Practices Act, 15 U.S.C. § 2801–2805 (PMPA); the last time we ventured into this territory was in *Thompson v. Amoco Oil Co.*, 705 F.Supp. 1349 (C.D.Ill.1989). We have already entered a preliminary injunction in Winks' favor, pursuant to § 2805(b)(2) of the PMPA, and we here enter summary judgment as to liability in his favor as well in both of these consolidated cases.

We now explain.

### Facts

A franchise relationship exists between Winks and Feeney Oil, as that term is defined by § 2801(2) of the PMPA, inasmuch as Feeney Oil has been supplying gasoline and other motor fuel products to Winks under the Shell brand name; Winks is the franchisee and Feeney Oil the franchisor within this relationship. Feeney Oil, in turn, is a franchisee to a franchise relationship with Shell Oil Company, because Feeney Oil is a "jobber," or distributor, of Shell-branded products. Both of the complaints filed in this consolidated action claim jurisdiction under the PMPA, by vir-

tue of the franchise relationship existing between Winks and Feeney Oil.

Sometime in the fall of 1988, Feeney Oil mailed to Winks a letter dated September 20, 1988, entitled "Notice of Termination," which purported to terminate the franchise agreement between the parties as of January 21, 1989, pursuant to ¶ 3 of the parties' Articles of Agreement. That paragraph provided that, "[a]t any time, either party hereto may cancel this agreement in total if unforeseen difficulties arise between said parties. Such cancellation shall require one hundred twenty (120) days' notice from the party desiring to cancel to the other party." Upon receipt of this Notice of Termination, Winks found a lawyer conversant with the terms of the PMPA, and filed suit in case 88–3305.

The September 20 Notice of Termination clearly did not comply with the requirements of the PMPA. For one thing, notification of the termination of the franchise relationship was wholly inadequate under the provisions of § 2804(c). Once apprised of the provisions of the PMPA with regard to notice of termination, Feeney Oil withdrew the September 20 Notice of Termination; the second affirmative defense to Winks' November 29, 1988, complaint states that "Feeney has withdrawn the Notice of Termination previously served by it upon Feeney (sic)" and a copy of the withdrawal was included with the answer to that complaint. Feeney Oil also argued that, since the Notice of Termination was withdrawn, the issues raised by Winks' complaint were moot and so the complaint should be dismissed. Winks responded to this contention by filing a motion for summary judgment pointing out that the PMPA is to be liberally construed, and provides for recovery in just such cases as the first Feeney Oil Notice of Termination, which was easily deflected by the PMPA lawsuit. We will return to this contention later; for now, suffice it to say that Winks is entitled to all costs, attorney's fees, and damages incurred in prompting Feeney Oil to withdraw the September 20 Notice of Termination.

The plot thickened on February 23, 1989, when Feeney Oil filed its own complaint seeking a declaratory judgment that a new Notice of Termination, appended to Feeney Oil's complaint and dated February 22, complied with the PMPA and established Feeney Oil's right to terminate the franchise relationship. This new Notice was delivered to Winks at the same time the declaratory judgment complaint was. Facially the new Notice of Termination appears to comply with the procedural aspects of the PMPA. As grounds for termination, Feeney Oil complains that Winks has failed to exert good faith efforts to carry out provisions of the franchise, thereby allowing termination pursuant to § 2802(b)(2)(C) of the PMPA. Specifically, Feeney Oil complained that it has received, through Shell Oil Company, numerous customer complaints which establish that Winks was not complying with an implied term of the parties' Articles of Agreement. These customer complaints take three forms: (a) some complaints concerned overcharges for gasoline, combined with inadequate price signs; (b) other complaints concerned substantial overcharges for parts and labor, as well as repair work done incorrectly; and (c) some complaints stated that Winks' station and/or restrooms were dirty.

In response to this complaint, Winks filed an answer which, among other things, raised as a defense this Court's lack of subject matter jurisdiction over the claim asserted, arguing that the PMPA does not confer a cause of action for declaratory judgment upon a franchisor. Also, Winks filed a counterclaim against Feeney Oil, alleging that the February 22 Notice of Termination wrongfully terminated the franchise relationship under the PMPA. Feeney Oil has answered this counterclaim. Thereafter, Winks filed a motion for partial summary judgment in the consolidated case, to include the complaint filed by Feeney Oil; in addition, Winks sought a temporary restraining order or preliminary injunction barring Feeney Oil from terminating the franchise agreement prior to resolution of this case on the merits. By order entered November 17, 1989, this Court al-

lowed that motion for a preliminary injunction, and set a further briefing schedule for the pending motions for partial summary judgment. The briefing period is now up, and we can finally turn our attention to those motions.

### Summary Judgment

Under Fed.R.Civ.P. 56(c), summary judgment should be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Nevertheless, the rule is also well established that the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). Thus, the "preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed." *Id.* at 251, 106 S.Ct. at 2511 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We might add that jury trials are available in at least certain cases arising under the PMPA. *Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380, 1385–86 (10th Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982).

We also note at this juncture that the PMPA possesses a different pattern of proof than do most civil actions. Pursuant to § 2805(c), the franchisee has the burden of proving that the franchise has been terminated; Winks has met that burden here, with Feeney Oil's help, because of the Notice of Termination dated February 22.

The burden therefore has fallen upon Feeney Oil to go forward with evidence, by way of affirmative defense, that the termination is permitted by § 2802(b); Feeney Oil points to the three categories of customer complaints to satisfy this burden. The issue to be resolved by these motions for summary judgment turns on whether Feeney Oil has raised any triable issue with its affirmative defense.

### The PMPA

The Petroleum Marketing Practices Act is remedial legislation intended "to strike a balance between the interests of the participants in a petroleum marketing franchise relationship," *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1220 (7th Cir.1982), and to equalize the bargaining power between the franchisor and the franchisee in such relationships. Previously the franchisor, in a far superior bargaining position to that of the franchisee, was often able to win contractual concessions which at times bordered upon the unconscionable. Although the PMPA has this as a general purpose, though, "the one thing the Act is clearly intended to prevent is the appropriation of hard-earned good will which occurs when a franchisor arbitrarily takes over a business that the franchisee has turned into a successful going concern." *Id.*

To accomplish these goals, the PMPA establishes as a general rule that termination or nonrenewal of a franchise or franchise relationship is prohibited. § 2802(a). In certain circumstances, however, the franchisor may escape this general prohibition and may terminate or nonrenew the relationship, by virtue of an affirmative defense found in either § 2802(b) or § 2803. *See generally* Annotation, *Termination of Nonrenewal of Franchise to Sell Motor Fuel in Commerce Under Petroleum Marketing Practices Act (15 USCS §§ 2808 et seq.)*, 53 ALR Fed. 348 (1981). The grounds for termination or nonrenewal relevant here are set out in § 2802(b)(2), and in pertinent part these include a "failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise."

§ 2802(b)(2)(B). This ground for termination or nonrenewal, however, is limited by requirements that the franchisor apprise the franchisee in writing of the failure to exert good faith efforts, and the franchisee must be "afforded a reasonable opportunity to exert good faith efforts to carry out such provisions;" further, "such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title."

Also relevant for our purposes is § 2802(b)(3) which does not address termination of ongoing franchise relationships, but rather supplies grounds for nonrenewal of a franchise relationship which is soon to expire of its own terms. Section 2802(b)(3)(B) provides as an acceptable ground of nonrenewal situations involving

[t]he receipt of numerous bona fide customer complaints by the franchisor concerning the franchisee's operation of the marketing premises, if—

(i) the franchisee was promptly apprised of the existence and nature of such complaints following receipt of such complaints by the franchisor; and

(ii) if such complaints related to the condition of such premises or to the conduct of any employee of such franchisee, the franchisee did not promptly take action to cure or correct the basis of such complaints.

Additionally, § 2802(b)(3)(C) allows nonrenewal in cases of

[a] failure by the franchisee to operate the marketing premises in a clean, safe, and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures.

Finally, even if a permitted reason for nonrenewal or termination exists under § 2802(b), the franchisor must still comply with the PMPA's notification requirements. Section 2804 of the Act requires that notification be made by sending a certified letter to the franchisee informing him of the intent to terminate or not renew, the effective date of the termination or nonrenewal, and the reasons for the decision to terminate or nonrenew. As we have seen, Feeney Oil has already run afoul of § 2804's notification requirements as to its September 20, 1988, Notice of Termination, and this failure precipitated the issuance of Feeney Oil's Notice of Withdrawal of that Notice of Termination.

The PMPA contains its own enforcement provisions as well, allowing wronged franchisees to bring civil actions against franchisors. § 2805. Such civil actions may entitle the franchisee to recover actual damages, exemplary damages where appropriate, attorney and witness fees, and any appropriate equitable relief including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Of course, Winks has already been granted *interim* equitable relief; we now award him *permanent* equitable relief as well, and the question of damages, exemplary damages, and attorney and witness fees will be addressed at a later date.

### Discussion

■ We begin by discussing whether this Court has jurisdiction to entertain Feeney Oil's complaint for declaratory relief under the PMPA. We hold that we have no such jurisdiction.

■ Feeney Oil's complaint purports that our jurisdiction is premised on the PMPA, yet § 2805(a) of that Act provides only that "the franchisee may maintain a civil action against [a] franchisor." Nowhere in the PMPA is there mention of suits by franchisors under that Act. Hence, the PMPA provides no basis for the declaratory relief sought by Feeney Oil. Further, to the extent Feeney Oil's complaint might be construed as falling under some state law cause of action, the complaint is preempted by the PMPA. § 2806(a). Likewise, even if we assume that Feeney Oil's declaratory action suit is brought pursuant to 28 U.S.C. § 2201(a), that provision only creates the remedy of a declaratory action, but provides no jurisdictional basis. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). Hence, no jurisdic-

tional basis exists upon which this Court can consider Feeney Oil's complaint.

The Court is well aware that no previous case has directly decided this issue, although in *Sun Refining & Marketing Co. v. Rago*, 741 F.2d 670, 671 n. 3 (3d Cir. 1984), the court took note that the PMPA "is silent as to whether a franchisor can seek a declaratory judgment of its right to terminate a franchise," and then held that "we need not decide this issue because Rago did not raise it as an affirmative defense pursuant to Fed.R.Civ.P. 8(c)." Here, of course, Winks did raise this jurisdictional question as a defense to Feeney Oil's complaint.

More fundamentally, though, this Court respectfully disagrees with the Third Circuit's analysis of this jurisdictional issue. This Court is one of limited jurisdiction, and the PMPA is exceedingly sparing in the jurisdictional grant it provides. Feeney Oil's complaint does not fall within that jurisdictional grant, nor is our jurisdiction granted by any other federal statute. Hence, we have no power to hear this case. *See, e.g., Rustom v. Atlantic Richfield Co.*, 618 F.Supp. 210 (C.D.Cal.1985) (holding that state courts have no jurisdiction to hear cases falling within the ambit of the PMPA, and therefore it had no derivative jurisdiction over a PMPA case removed from state court). Moreover, this Court further respectfully disagrees with the requirement implied in the *Rago* case that this jurisdictional question be raised as an affirmative defense; our jurisdiction under the PMPA, as under any other statute, is always subject to being raised *sua sponte.*

At any rate, we hold that we have no jurisdiction to hear Feeney Oil's declaratory judgment complaint under the PMPA. This leaves, however, Winks' counterclaim and complaint, both of which are the subject of motions for summary judgment. We now turn to these.

 Winks' motion for summary judgment, insofar as it pertains to the September 20, 1988, Notice of Termination, is clearly meritorious; Feeney Oil.has essentially conceded the ineffectiveness of that Notice of Termination by subsequently submitting its Notice of Withdrawal of that Notice of Termination. Hence, as previously noted, Winks will be entitled to all costs, fees, and damages (and perhaps exemplary damages as well) flowing from that ill-fated Notice of Termination.

Winks also seeks a summary judgment as to liability with respect to the second Notice of Termination which was submitted along with Feeney Oil's declaratory judgment complaint. Although this latter notice, dated February 22, 1989, was part and parcel of the declaratory judgment complaint which we have no jurisdiction to hear, Feeney Oil also contends that this new Notice of Termination is an effective termination of the franchise relationship. Winks has therefore attacked the substance of this latter Notice, raising many arguments concerning its invalidity; we shall address only three here. Specifically, we will consider whether Feeney Oil's stated reasons for termination pursuant to § 2802(b)(2)(B) might more properly be the grounds for a nonrenewal of the franchise relationship pursuant to § 2802(b)(3)(B); we will also consider whether Feeney Oil met the notice requirements of § 2802(b)(2)(B)(ii), and finally we will consider whether the stated failings of Winks were in fact "provisions of the franchise" within the meaning of § 2802(b)(2)(B).

As previously noted, Feeney Oil has sought termination of this franchise relationship due to Winks' alleged failure to "exert good faith efforts to carry out the provisions of the franchise," and in support of this allegation Feeney Oil points to numerous customer complaints, falling into three broad categories, which it contends establish that Winks has not complied with its agreement with Feeney Oil. Specifically, Winks' customer complaints contend that he has overcharged the motoring public for gasoline and simultaneously failed to advertise his gasoline prices properly, that Winks has overcharged the motoring public for parts and for labor done during automobile repairs and has performed such work incorrectly, and that Winks' restrooms and station are dirty.

In response to these charges, Winks argues that these grounds for termination would more properly be raised as grounds for nonrenewal of a franchise agreement pursuant to § 2802(b)(3)(B) of the PMPA. This provision expressly provides for the nonrenewal of the franchise relationship in the event the franchisor receives "numerous bona fide customer complaints ... concerning the franchisee's operation of the marketing premises." Feeney Oil rejoins, though, that the termination is not premised on the customer complaints themselves, but rather is premised upon the fact that those customer complaints evidence a breach an implied provision in the parties' franchise agreement.

■ On this issue we must side with Feeney Oil. The customer complaints, standing alone, undoubtedly can only give rise to a nonrenewal pursuant to subsection (b)(3)(B). In the event, however, that a contractual provision exists which would establish that those customer complaints breached the franchise agreement, it seems reasonable that a termination can be effected pursuant to subsection (b)(2)(B). Of course, the remedial purpose of the PMPA might effect the interpretation of those customer complaints vis-a-vis subsection (b)(2)(B); here, however, we need not determine whether the PMPA has been complied with in this regard, since we determine that it has not been complied with in another regard.

■ Winks' next bone of contention with the February 22, 1989, Notice of Termination is that, although that Notice purports to effect a termination pursuant to § 2802(b)(2)(B) of the PMPA, the Notice failed to comport with that subsection's notification requirements. Specifically, subsection (b)(2)(B) allows for a termination in the event the franchisee fails to "exert good faith efforts to carry out the provisions of the franchise," but only if:

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

(ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

Feeney Oil has identified its February 22 Notice of Termination as the date of notification of termination required by § 2804. Hence, for the Notice of Winks' failure to exert good faith efforts to comply with the franchise agreement to be effective, it had to have been made "not more than 180 days before" February 22, 1989. Feeney Oil indicates that it apprised Winks, in writing, of his failure to carry out the provisions of the franchise each time a customer complaint was received; Thomas Feeney, in his deposition, indicates that these complaints were forwarded to Winks without comment. At any rate, after receipt of those complaints, Winks had to have been provided a reasonable opportunity to rectify the situation, but to have still failed to comply with the franchise provisions for no more than 180 days prior to February 22, 1989. The Senate Report discussing this provision of the PMPA, S.Rep. No. 95–731, 95th Cong., 2d Sess. 34, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 892, explains this perhaps more clearly:

the franchisor may not base termination or nonrenewal upon any such failure [to exert good faith efforts to carry out the provisions of the franchise] if more than 180 days have elapsed between the occurrence of the last act in the course of conduct constituting the alleged failure to exert good faith efforts to carry out the provisions of the franchise and the date notification of termination or nonrenewal is provided.

The file does not reflect that any customer complaints were received by Winks during the period commencing 180 days prior to February 22, 1989. Feeney Oil has submitted some complaints which were forwarded to Winks *after* February 22, but those, of course, do not count in making this determination. In short, it appears that Feeney Oil has failed to comply with the notice provisions of subsection (b)(2)(B),

and therefore its attempt to terminate on that basis is ineffective.

■ Additionally, we question whether the mere forwarding of customer complaints to Winks, without additional comment, adequately complied with subsection (b)(2)(B), contrary to Feeney Oil's contention that this apprised Winks of his failure to comply with the provisions of the franchise. In his deposition, Thomas Feeney, an officer of Feeney Oil, acknowledged that these customer complaints were merely forwarded to Winks without any additional comment by either Feeney Oil or Shell Oil Company. Further, Feeney Oil never followed through on any of the complaints; once the complaints were forwarded to Winks, Feeney Oil treated the matters as closed. Although the PMPA does not specify the precise form of the notice to be afforded the franchisee under subsection (b)(2)(B)(i), it seems clear that the notice must at least specify the provision of the franchise being breached by the franchisee. Here Feeney Oil was mute on this point, and Winks, as he states in his affidavit, was taken by surprise with Feeney Oil's Notice of Termination, which should not have happened had subsection (b)(2)(B)(i) been complied with.

We also note that, inasmuch as Winks was never "apprised by the franchisor in writing" of his dereliction, neither was he "afforded a reasonable opportunity to exert good faith efforts to carry out" the provisions of the franchise which were allegedly breached. The "reasonable opportunity" to cure must be provided *after* the franchisee is apprised in writing of his failure, and the franchisor's neglect in apprising the franchisee necessarily means that the franchisee is not given a reasonable opportunity following that appraisal to cure. Hence, we find that Feeney Oil has wholly failed to comply with the provisions of § 2802(b)(2)(B) of the PMPA.

■ Finally, even had Feeney Oil fully complied with the procedural requirements of the PMPA in seeking to terminate Winks, we find that Feeney Oil has failed to establish that the customer complaints in question amount to a failure by Winks to

carry out the provisions, implicit or explicit, of his franchise agreement with Feeney Oil. Again, Feeney Oil has alleged three categories of customer complaints: overcharges for gasoline along with inadequate price signs, overcharges for parts and labor along with shoddy repair work, and dirty station complaints. In addition, Feeney Oil complains that Winks has failed to comply with Shell Oil Company's service station image requirements. Although the Articles of Agreement between Feeney Oil and Winks says nothing expressly about any of these four matters, Feeney Oil contends that an oral agreement exists between the parties that Winks would adhere to Shell Oil Company's appearance and image requirements, as well as its requirements vis-a-vis customer complaints. Despite Feeney Oil's contentions, though, the deposition testimony of Thomas Feeney clearly establishes that either the alleged deficiencies were not, in fact, part of the agreement between the parties, or that Winks did not violate those implied terms. We will discuss each of the four points in opposite the order presented above.

With respect to Feeney Oil's contention that Winks failed to comply with Shell Oil Company's *image* requirements, Thomas Feeney's deposition testimony acknowledges over and over again that at the time the February 22, 1989, Notice of Termination was served on Winks, he was *not* in violation of any image requirements of Shell Oil Company. Not only had Feeney Oil never been informed by Shell that Winks was in violation, but Feeney also indicated that he did not know whether Shell Oil Company had contacted Winks directly concerning any image violations. The best that can be culled from the deposition testimony is that Feeney had the "feeling," based upon one or two short conversations with Winks, that Winks would not upgrade his station to comply with future image requirements of Shell Oil Company. Since the PMPA only allows termination for existing defaults, this termination based on the possibility of future defaults simply will not do. This complained-of breach is not only pure speculation, but is

not even a "breach" within the terms of the PMPA since the subsection in question does not recognize anticipatory breaches. Hence, it is clear that Winks has not violated any implied requirement that he comply with Shell Oil Company's image requirements.

With regard to the *dirty station* complaints, we will assume, without deciding, that this was an implied term in the contract. Nevertheless, Feeney's deposition testimony establishes that these complaints did not breach that implied contract term, and that even if they did Winks has made a good faith effort to remedy the problem. Indeed, at one point Feeney stated that "I would guess that he's doing his best effort," in response to the question "Do you have any reason to believe that Mr. Winks hasn't used his best efforts to keep his station clean?" Further, Winks had no complaints concerning his restrooms since 1987, and prior to that he only had a handful. This *de minimis*, at best, breach of this implied contractual term, coupled with the lapse of time before Feeney Oil held the breach against Winks, would not amount to a "breach" sufficient to nullify a contract under normal contract law, let alone under the remedial standards of the PMPA. The Court therefore finds that these dirty station complaints, even in conjunction with other customer complaints, do not constitute a "failure ... to exert good faith efforts to carry out the provisions of the franchise" within the meaning of the PMPA.

As intimated above, the subsection of the PMPA under which Feeney Oil is proceeding does not speak in terms of "breaching" the franchise agreement, but instead speaks of the franchisee's failure to exert good faith efforts to carry out the franchise provisions. With respect to Winks' customer complaints for *overcharges* for *parts* and *labor* and for work done incorrectly, once again Feeney Oil has failed to show that Winks did not exert such good faith efforts. In Thomas Feeney's deposition, the best he could say is that it is "possible" that Winks was not using his best efforts to repair cars, and this only because of the amount and types of customer complaints received. Feeney Oil, though, does not follow up on its customer complaints, nor did Thomas Feeney know Winks' volume of repair work or ratio of properly priced and completed repair work to that improperly priced and completed. Feeney acknowledged that Winks, located near two interstate highways, has a highly transient clientele, and also acknowledged that this type of clientele is more likely to make false accusations concerning repair work than are local customers; this is so because when Shell Oil Company receives a customer complaint on a credit card purchase, it "charges back" the amount in dispute, and if the dealer (such as Winks) wishes to pursue the matter further, it is up to him to deal directly with the customer. This, of course, is difficult for small, local dealers such as Winks when dealing with clientele from across the country. Anyway, Feeney Oil never checked to see whether the customer complaints were valid, nor to see whether they were the result of Winks failing to exert his best efforts. A "possibility" that the best efforts were not being exerted is simply not enough; Feeney Oil has again failed to show that these complaints "breached" the franchise agreement within the meaning of the PMPA. Additionally, in light of Feeney Oil's failure to follow up on customer complaints, it can hardly be said that Winks was afforded the opportunity to exert good faith efforts to carry out the franchise's provisions. In short, subsection (b)(2)(B) was not violated by these complaints.

Finally, Feeney Oil has passed on to Winks several complaints alleging that Winks *overcharged* for *gasoline* and failed to properly *post* his full service gasoline *prices*. Apparently, some customers pulled up to full service pumps, and were shocked to find out that the full service gasoline price was significantly higher than the self-service prices. These complaints, however, breach no provision—implied or express—of the agreement between these parties. Thomas Feeney, over and over again in his deposition, acknowledged that Feeney Oil has no policy with respect to pricing by its dealers; he also stated that, to his knowl-

edge, Winks had never violated any federal or state statute or regulation with regard to pricing or advertising of prices. Feeney acknowledged that the custom of the retail gasoline industry is to charge higher prices for full service than for self-service, and that to his knowledge no stations (even those operated by Feeney Oil itself) post full service prices anywhere but on the pump itself. Feeney conceded that to the best of his knowledge Winks posted his full service prices on the pump itself. We do not see how any of this violated any provisions of the agreement between the parties. Hence, no termination pursuant to subsection (b)(2)(B) can be accomplished by virtue of these complaints.

### Conclusion

The stated grounds for termination have therefore vanished into thin air, and Feeney Oil is left with no good reason to seek Winks' termination. The real story, we think, can be found in Thomas Feeney's deposition. Apparently just prior to the time Feeney Oil first attempted to terminate Winks in September of 1988, a shiny new, large and slick station was built near Winks' location. This station, operated by Yankee Quality Oil Company, entered into a supply agreement with Feeney Oil; as part of that agreement Feeney Oil agreed to not supply gasoline to any other dealer within a certain radius, and unfortunately Winks was located within that radius. Since the Yankee Quality station estimated its yearly gasoline requirements at over 100,000 gallons, Feeney Oil was moved to terminate its relationship with Winks to secure its better deal with the Yankee Quality station. Were it not for the PMPA, Feeney Oil would have been at liberty to do so.

This is just the sort of situation, though, that the PMPA was enacted to avoid. By virtue of that Act, Feeney Oil has certain responsibilities towards its franchisee Winks, and cannot arbitrarily extinguish that relationship merely because it suits Feeney Oil's current economic whims. In short, these actions appear to be a blatant violation of both the spirit and the letter of the PMPA.

This leaves us with the question of damages. As noted, § 2805(d) provides for both actual and exemplary damages, attorney and expert witness fees, and injunctive relief. We herewith grant Winks permanent injunctive relief with respect to the grounds of termination raised by the February 22, 1989, Notice of Termination. Further, we will henceforth try the issue of damages.

*Ergo,* as set out above, Feeney Oil's complaint filed in case 89–3052 is DISMISSED for want of subject-matter jurisdiction; conversely, a summary judgment is hereby ENTERED in favor of Winks, on the issue of whether the February 22, 1989, Notice of Termination violated the provisions of the PMPA, with respect to Winks' complaint in case 88–3305 and counterclaim in case 89–3052. Feeney Oil is hereby PERMANENTLY ENJOINED from terminating the franchise relationship between it and Winks based upon its February 22, 1989, Notice of Termination.